# EXHIBIT A

JS 44 (Rev. 02/19)  **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

FARI MURRAY, CARLOS PALAGOACHI, and WARREN PAYNE

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

**DEFENDANTS**

UNITED PARCELS SERVICE, INC

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF
       THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 840 Trademark | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☒ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | | |
| | | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):* 28 U.S.C. 1367 (a)

Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**

*(See instructions):*  JUDGE _____  DOCKET NUMBER _____

DATE  3/17/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

# CERTIFICATION OF ARBITRATION ELIGIBILITY

Case 2:20-cv-00762-GRB-JMW Document 2 Filed 02/09/20 Page 3 of 63 PageID #:249

Local Arbitration Rule 83.7 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000 exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

Case is Eligible for Arbitration ☐

I, _Tyrone Blackburn_, counsel for _Plaintiffs_, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☐ monetary damages sought are in excess of $150,000, exclusive of interest and costs,

☑ the complaint seeks injunctive relief,

☑ the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.) Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County? ☐ Yes ☑ No

2.) If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County? ☑ Yes ☐ No

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? ☑ Yes ☐ No

c) If this is a Fair Debt Collection Practice Act case, specify the County in which the offending communication was received:

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?____ ☐ Yes ☐ No
*(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).*

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

☐ Yes ☐ No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

☐ Yes (If yes, please explain ☐ No

I certify the accuracy of all information provided above.

Signature: _Tyrone Anthony Blackburn_

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____x
FARI MURRAY,
DANIEL MOYLE,
ROY WELSH,
CARLOS PALAGUACHI,
ROBERT SANTIAGO,
AHMED RADWAN,
TYLER LILLY,
TRAVIS STEELE,
and
WARREN PAYNE,
_individually and on behalf of others similarly_
_situated,_

                                       Plaintiff's

                          -against-

Case Number 20-1427
DEMAND FOR JURY TRIAL
CLASS ACTION
COMPLAINT UNDER N.Y.
CPLR § 901
FIFTH AMENDED
COMPLAINT

UNITED PARCELS SERVICE, INC.,
WILLIAM GREY, and
LLOYD HALL                    Defendants.
_____ x

      Plaintiffs Fari Murray ("Plaintiff Murray" or "Mr. Murray"), Daniel Moyle ("Plaintiff Moyle" or "Mr. Moyle"), Roy Welsh ("Plaintiff Welsh" or "Mr. Welsh"), Carlos Palaguachi ("Plaintiff Palaguachi" or "Mr. Palaguachi"), Robert Santiago ("Plaintiff Santiago" or "Mr. Santiago"), Ahmed Radwan ("Plaintiff Radwan" or "Mr. Radwan"), Travis Steele ("Plaintiff Steele" or "Mr. Steele"), Tyler Lilly ("Plaintiff Lilly" or "Mr. Lilly") and Warren Payne ("Plaintiff Payne" or "Mr. Payne") (Collectively, "Plaintiffs") individually and on behalf themselves and others similarly situated, by and through their attorneys, Tyrone Blackburn Esq, of T. A. Blackburn Law, PLLC., Rodney S. Diggs, Esq., of IVIE McNEIL WYATT PURCELL & DIGGS and Kevin Mahoney, Esq. and Berkeh Alemzadeh, of Mahoney Law Group, APC, upon their knowledge and belief, and as against Defendant's United Parcels Service, Inc. d/b/a UPS ("Defendant"), William Grey, and Lloyd Hall or ("Individual Defendants") alleges as follows:

1

## NATURE OF ACTION:

**New York Labor Law Class Claims:**

1. This action is brought under New York Labor Law, specifically N.Y. Labor Law § 190 et seq. and 650 et seq. (The "NYLL"), NYLL § 190 et seq. and 663 et seq., NYLL § 195 (1), NYLL § 195 (3), NYLL § 195 (4), 12 NYCRR § 142-2.2, NYLL, Article 6, § 198 (1-d), and CPLR § 901(a)(1) on behalf of the Plaintiffs and a putative class of individual who furnished labor, and more specifically, were Delivery Drivers for Defendants UPS, its management and/or agents, and more specifically, William Grey and Lloyd Hall and/or any other entities affiliated with or controlled by Defendant UPS to recover unpaid wages and overtime wages for work performed for Defendants by Plaintiffs and other members of the putative Class. The plaintiffs seek monetary and declaratory relief to redress the Defendant's intentional violation of the plaintiff' and putative class members' workplace rights, including but not limited to failure to pay minimum wages, overtime wages, and back wages.

2. Beginning in approximately April 2014 and upon information and belief, continuing through the present, alleges that Defendants maintained a policy and/or practice against Plaintiffs, putative class members, and other similarly situated employees wherein Defendant required Package Delivery Drivers to work an excess of forty (40) hours a week without providing the required minimum wage and/or overtime compensation as required by New York Labor Law § 652.

3. Beginning in approximately April 2014 and upon information and belief, continuing through the present, alleges that Defendants maintained a policy and/or practice against Plaintiffs and putative class members wherein Defendants failed to provide Plaintiffs and putative class members with paystubs that correctly reflected the number of hours worked, as well as the rate of pay for all hours worked as required by New York Labor Law § 195(3).

4. The named Plaintiffs, putative class members, and other similarly situated employees seek relief for the Defendant's violation of N.Y. Labor Law § 190 et seq. and 650 et seq. (The "NYLL"), NYLL § 190 et seq. and 663 et seq., NYLL § 195 (1), NYLL § 195 (3), NYLL § 195 (4), 12 NYCRR § 142-2.2, NYLL, Article 6, § 198 (1-d), and CPLR § 901(a)(1).

5. Plaintiffs Palaguachi, Santiago, Radwan, Lilly, Steele, Moyle, Welch, and Payne now bring this action on behalf of themselves and other similarly situated employees for unpaid minimum, overtime wages, and back wages according to N.Y. Labor Law § 190 et seq. and

2

650 et seq. (The "NYLL"), including applicable liquidated damages, interest, attorneys' fees, and costs.

6. Plaintiffs Palaguachi, Santiago, Radwan, Lilly, Steele, Moyle, Welch, and Payne seek certification of this action as a class action on behalf of themselves individually, former employees, and all other similarly situated employees who do not elect to opt out of this action according to N.Y. Labor Law § 190 et seq. and 650 et seq. The purported Class comprises of Delivery Drivers in the state of New York.

**Fari Murray Individual Claims:**

7. Plaintiff Murray alleges that at all times relevant to this Complaint, Defendant UPS maintained a policy and practice of knowingly and willfully compensating black and/or minority "On-Road Supervisors," less than their Caucasian colleagues, in violation of NYCHRL and NYSHRL.

8. Plaintiff Murray seeks relief for employment discrimination violating CPLR 214 (4), N.Y. Exec. Law § 296, ("NYCHRL") Administrative Code of City of New York § 8-107 (7), Administrative Code of City of New York § 8-107 (6), Unjust Enrichment, N.Y. Lab. Law § 740, and Administrative Code of City of New York § 8-107 (13).

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action as all the Plaintiffs and several defendants are domiciled in the State of New York. Defendant UPS owns several properties and conducts business in New York.

10. The venue is proper in this district under NY CPLR § 503 (2012) because one or more of the parties reside in this district, including Plaintiffs Santiago, Radwan, and Steele. Additionally, all, or a substantial portion of, the events or omissions giving rise to the claims occurred in this district. Defendant UPS maintains several branches and offices within this district, and Defendant UPS operates a package delivery business located in this district. Further, Plaintiffs are or were employed by Defendant UPS in this district.

///

///

///

///

3

## PARTIES

**Plaintiff Fari Murray:**

11. Plaintiff Fari Murray is an adult, English-speaking African-American male who resides in Westchester County, New York. Defendant United Parcels Service employed Plaintiff Murray from approximately January 4, 2003, to October 8, 2018.

12. For this litigation, Plaintiff Murray is not a class participant in the prospective NYLL Class Action.

**NYLL Plaintiffs:**

13. Plaintiff Daniel Moyle is an adult, English-speaking Caucasian male who resides in Bronx County, New York. Defendant United Parcels Service employed plaintiff Moyle from approximately July 9, 2012, to August 21, 2019.

14. Plaintiff Roy Welsh is an adult, English-speaking Caucasian male who resides in New Orleans, Louisiana. Plaintiff Welsh is Jewish, and he is religiously observant. Plaintiff Welsh was employed by Defendant United Parcels Service from approximately June 26, 2016, until July 20, 2019.

15. Plaintiff Carlos Palaguachi is an adult, Spanish-speaking Latinx male who resides in Bronx County, New York. Defendant United Parcels Service employed plaintiff Palaguachi from approximately October 2017 until May 2018.

16. Plaintiff Warren Payne is an adult, English-speaking African-American male who resides in Kings County, New York. Defendant United Parcels Service employed plaintiff Payne from approximately August 2017 until June 2018.

17. Plaintiff Robert Santiago is an adult, English, and Spanish-speaking male who resides in Kings County, New York. Plaintiff Santiago was employed by Defendant United Parcels Service from approximately April 7, 2014, until October 18, 2020.

18. Plaintiff Ahmed Radwan is an adult, English, and Arabic-speaking male who resides in Kings County, New York. Plaintiff Radwan was employed by Defendant United Parcels Service from approximately July 2018 until October 1, 2018.

19. Plaintiff Travis Steele is an adult, English, and Hebrew-speaking male who resides in Kings County, New York. Defendant United Parcels Service employed plaintiff Steele from approximately September 2014 until May 2021.

20. Plaintiff Tyler Lilly is an adult, English, and Spanish-speaking male who resides in Kings County, New York. Defendant United Parcels Service employed plaintiff Lilly from approximately November 2019 until March 2022.

21. Plaintiff Payne consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

22. Plaintiff Palaguachi consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

23. Plaintiff Steele consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

24. Plaintiff Radwan consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

25. Plaintiff Santiago consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

26. Plaintiff Lilly consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

27. Plaintiff Welsh consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

28. Plaintiff Moyle consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

**Defendant(s)**

29. Defendant UPS, an Atlanta, Georgia corporation, owns, operates, or controls a package delivery service business at all relevant times, located at 10401 Foster Avenue, Brooklyn, NY 11236, under the name "United Parcel Service, Inc."

5

30. Upon information and belief, Defendant William Grey is a State of New York resident and a Business Manager at Defendant Corporation. Defendant Grey is also the former supervisor of Plaintiff Murray. As the Business Manager, Defendant Grey has an ownership interest in Defendant Corporation through its management benefits plan. Additionally, Defendant Grey participated in the day-to-day operations of the Corporate Defendant and acted intentionally and maliciously and is an "employer" under the New York Labor Law Sec. 2 and the regulations thereunder and is jointly and severally liable with the Corporate Defendant. Defendant Grey directed the actions of his employees (including Mr. Murray), set their schedules, and had the power to hire and fire as not only an agent of Defendant UPS.

31. Upon information and belief, Defendant Lloyd Hall is a State of New York resident and a Business Manager at Defendant Corporation. Defendant Hall is also the former supervisor of Plaintiff Welsh. As the Business Manager, Defendant Hall has an ownership interest in Defendant Corporation through its management benefits plan. Additionally, Defendant Hall participated in the day-to-day operations of the Corporate Defendant and acted intentionally and maliciously and is an "employer" under the New York Labor Law Sec. 2 and the regulations thereunder and is jointly and severally liable with the Corporate Defendant. could hire and fire. Defendant Hall directed the actions of his employees (including Mr. Welsh), set their schedules, and had the power to hire and fire as not only an agent of Defendant UPS.

## CLASS ACTION ALLEGATIONS[1]

32. Plaintiffs, putative Class, and similarly situated employees bring the NYLL claims under N.Y. CLS CPLR § 901 on behalf of themselves and a class of persons consisting of:

> **All persons who work or have worked as delivery drivers for Defendant Corporation in the State of New York between 2014 and the date of final judgment in this matter (the "Class").**

33. The Class Members are so numerous that the joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.

34. Plaintiffs' claims are typical of the claims of the Class, and the relief sought is typical of the relief sought by the Class.

---

[1] The NYLL and prevailing caselaw clearly **states** that for employees exempt from the FLSA under the Motor Carrier Exemption, employers must provide overtime compensation at a rate of one and one-half times the minimum wage. Hayward v. IBI Armored Servs., 954 F.3d 573, 576 (2d Cir. 2020).

35. The Plaintiffs and the putative class members have all been injured in that they have been uncompensated and/or under-compensated due to Defendants standard policies, practices, and patterns of conduct.

36. Defendant UPS's corporate-wide policies and practices affected all Class Members similarly, as the Class Members were subject to Defendants' policies and practices statewide.

37. Defendants benefited from the unfair, wrongful, and unlawful treatment they visited upon each Class Member.

38. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests antagonistic to the Class[2].

39. Plaintiffs are represented by attorneys who are experienced and competent in employment law and, more specifically, wage-an-hour class actions.

40. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of wage and hour litigation where individual class members lack the financial resources to prosecute a lawsuit against a corporate defendant vigorously.

41. Class action treatment will permit similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

42. Common questions of law and fact exist as to the Class and predominate over any questions affecting individual Class Members, including but not limited to the following:

    a. Whether Defendants failed to compensate the Class Members for all hours worked at their regular rate(s) of pay [**NY CLS Labor § 191**];

    b. Whether Defendants failed to compensate Class Members for hours worked more than forty (40) per workweek under [**12 NYCRR § 142-2.2**];

    c. Whether Defendants failed to furnish Class Members with accurate statements with every payment of wages, as required by the NYLL [**NY CLS Labor § 195**];

    d. Whether Defendants failed to maintain and preserve contemporaneous, true, and accurate payroll records for the Class Members, showing for each week worked, the rate or rates of pay, and basis thereof, as required by the NYLL [**NY CLS Labor § 195 [4]**];

---

[2] Plaintiffs are prepared to sever all unrelated causes of action in an effort to preserve the integrity of the class action.

7

e. Whether Defendants failed to provide Class Members with paystubs that accurately reflect their hours worked, rate of pay, and amount paid, as required by the NYLL [**NY CLS Labor § 195 [3]**];

43. The nature and extent of the class-wide injury and the measure of damages for those injuries.

## FACTUAL ALLEGATIONS

*Defendants Constitute Joint Employers*

44. Upon information and belief, Defendant UPS operates a package delivery service throughout the New York State.

45. Defendant UPS and Defendants William Grey and Lloyd Hall possessed substantial control over Plaintiffs and the Class working conditions, wherein its policies and practices concerning Plaintiffs and Class Members' employment and compensation were uniformly implemented with respect to Plaintiffs and the Class.

46. Defendants employed Plaintiffs, the Class, and all similarly situated employees and is their employer within the meaning of N.Y. CLS CPLR § 901et seq. and the NYLL.

47. In the alternative, Defendant UPS and individual defendants constitute a single employer of the Plaintiff, the Class, and all similarly situated employees.

48. At all relevant times, Defendants are the employer within the meaning of the NYLL. Defendants had the power to hire and fire controlled the terms and conditions of employment, and determined the rate and method of compensation for Plaintiffs and the Class.

*Defendants Engaged In Wage Theft*

49. Plaintiffs allege that Defendants stole hundreds of hours of overtime from Plaintiffs and the Class.

50. Plaintiffs further allege that many Class Members start work at 7 a.m. or 9 a.m. and punch out at 10 p.m. or 11 p.m., which amounts to working up to sixteen (16) hours per day at times.

    a. Plaintiffs further allege that Plaintiffs and the Class worked anywhere from an average of ten (10) to sixteen (16) hours a day, which is a 5-day work week, Plaintiff and the Class work an average of fifty (50) to eighty (80) hours a week.

8

51. Plaintiffs also allege that the Class, on average, worked six (6) days a week, which amounted to anywhere from eighty (80) to ninety (90) hours per week; however, Defendants failed to compensate Plaintiffs and the Class for all hours worked in a week.

52. Plaintiffs allege that they have first-hand knowledge of the scheme by Defendants to steal overtime hours from Plaintiffs and the Class.

53. Plaintiffs allege that Defendants would go into the GTS (Global Timecard System) and unilaterally change the delivery drivers' punch-in and punch-out times without authorization from the Class Members in order to not have to pay both minimum and overtime wages.

54. Defendants' unlawful policies and/or practices worked solely for the benefit of Defendants, in that Defendants were able to retain unlawfully the wages of Plaintiffs and the Class for hours worked.

55. Plaintiffs further allege that Defendants engaged in a pattern and/or practice of manipulating Plaintiffs and Class Members' time, solely for the benefit of Defendants, which is in violation of the Department of Transportation ("DOT") rules and regulations and more specifically § 395.3 Maximum driving time for property-carrying vehicles. [**49 CFR 395.3**].

56. Plaintiffs also allege that Defendants knowingly and willfully required Plaintiffs and the Class to work beyond their allotted DOT hours.

57. Plaintiffs further allege in addition to the harm visited against the Class members, Defendants required On-Road-Supervisors to work anywhere from fifteen (15) to eighteen (18) hours a day, knowing that On-Road-Supervisors hours are not recorded because they are not required to punch in or punch out, which allowed Defendants to violate [**49 CFR 395.3**].

*Plaintiff Murray Is A Victim Of Wage Discrimination*

58. Plaintiff Murray alleges that Defendants discriminated against him because of his race, paying him thousands of dollars less than his Caucasian counterparts even though he had to do the same work, which required the same skills and effort. Mr. Murray earned approximately eighty thousand dollars ($80,000.00) base salary as an "On--Road supervisor," while his Caucasian male counterpart earned over one hundred thousand dollars ($100,000.00) base salary.

59. Plaintiff Murray further alleges that he was more qualified, including more years of experience and service with Defendant UPS, than his Caucasian counterparts, at least one (1) of whom he trained.

9

60. Plaintiff Murray further alleges that Defendant UPS's policy states that "new driver trainees are on probation and must stay accident-free while in training and on probation, however, Plaintiff Murray is aware of at least one person, specifically, Patrick Scanlon (hereinafter "Mr. Scanlon"), who was involved in an accident, wherein Mr. Scanlon collided with Plaintiff Murray's vehicle.

61. Plaintiff Murray further alleges that Mr. Scanlon was not fired or reprimanded by UPS, however, upon learning of the accident, Defendant UPS instructed Plaintiff Murray not to make a "big deal" about the accident and pressured him not to make an insurance claim to his carrier, which resulted in Plaintiff Murray having to absorb thousand dollars' worth of damage to his vehicle, which is not the only vehicle that Mr. Scanlon has damaged as a result of his driving.

62. Plaintiff Murray further alleges that Mr. Scanlon was not terminated and was promoted to an On-Road-Supervisor within approximately one month of being hired.

63. Plaintiff Murray also alleges that in addition to Mr. Scanlon, Mr. Murray was compensated less than Roy Welsh, Carl Lucateli, Joseph Simeone, and Robert "Bob" Walsh. Plaintiff Murray further alleges that these individuals were all Caucasian, were all On-Road-Supervisors when Mr. Murray was employed with UPS, and all possessed the same skills and knowledge that Mr. Murray had when he was promoted to "On-Road Supervisor," and their job descriptions were the same as Plaintiff Murray.

*Mr. Murray Was Terminated For Being A Whistleblower and Raising Concerns About Racial Discrimination*

64. Defendant UPS retaliated against Plaintiff Murray because Plaintiff Murray raised claims of race discrimination by Defendant by and through its senior management because of an investigation on or about August to September 2018 regarding a failed car accident coverup by Mr. Grey.

65. Upon information and belief, during the investigation, Mr. Murray provided Beverly (HR manager of the 43rd Street Manhattan, NY location) with printed screenshots of text messages concerning the unpaid overtime and straight-time hours of delivery drivers. Examples of Screenshots provided to Beverly are detailed in the First Cause of Action below.

10

66. Upon information and belief, during the investigation, Mr. Murray provided Beverly with photos showing that On-Road Supervisors and drivers are required to deliver packages with their vehicles while not being compensated for their mileage or gas.

67. Upon information and belief, during the car accident coverup investigation, Plaintiff Murray provided Beverly with details of the discriminatory and unfair treatment of Latino, African American, and Indian delivery drivers compared to Caucasian drivers. Specifically, Plaintiff Murray alleges that Defendant UPS terminated non-Caucasian drivers who got into accidents, and more specifically, Driver Ramkishun (Indian) and Driver Acosta (Latino); however, Defendant UPS, by and through its management, failed and/or refused to terminate Caucasian drivers such as Scanlon, who (while on probation) got into several automobile accidents while driving the UPS truck. Instead, Defendant UPS promoted Mr. Scanlon to "On-Road Supervisor" in light of and despite the accidents that Mr. Scanlon was involved in. Regrettably, Mr. Murray noted that he believed that the only justification for this apparent discrepancy in treatment is that Driver Ramkishun and Driver Acosta are Indian and Latino, respectively, while Scanlon is Caucasian.

68. Plaintiff Murray further alleges that during the car accident coverup investigation, Plaintiff Murray provided Beverly with details of the discriminatory and unfair treatment of non-Caucasian "On-Road Supervisors" compared to that of the Caucasian On-Road Supervisors by Defendant UPS.

69. Upon information and belief, Plaintiff Murray provided Beverly with details of discriminatory treatment during the car accident coverup investigation. Plaintiff Murray also alleges that he was paid less than all of his Caucasian counterparts who are or were "On-Road Supervisors" (specifically, Patrick Scanlon, Roy Welsh, Carl Lucateli, Joseph Simeone, and Robert "Bob" Walsh) and that the only justification for such discrepancy in terms of compensation was the fact that he was African American, and his colleagues were Caucasian.

70. Mr. Murray also pointed out that he was required to deliver packages out of his vehicle and was never compensated for his time, gas, or mileage.

   a. On or about March 30, 2018, at 5:50 p.m., Mr. Murray texted William Grey: "My expense account? last month never got approved n, now this month". William Grey responded, "I approved," "Unless John didn't. resubmit". William Grey then said, "Call me." When Mr. Murray called him, William Grey chastised him for putting this request in a text message and informed him that they stopped approving the expense report because they were over budget.

11

71. Plaintiff Murray alleges that he made several complaints to Defendant UPS Human Recourses concerning Defendants' policy and practice of intimidating Plaintiff Murray and other employees of Defendant UPS to discourage any DOT violation complaints on behalf of the "On-Road Supervisors" who were working seventeen (17)-hour shifts. Defendant UPS had a policy and/or practice of requiring "On-Road-Supervisors" to work a seventeen (17)-hour shift, return home, and then return for an in-person meeting or another shift after only a few hours of sleep, however, they were not paid overtime.

72. Plaintiff Murray and the other "On-Road-Safety Supervisors" were not afforded the right to follow the summary of regulations provided by the FMCSA with respect to hours of safety but would be subjected to threats of being written up and/or termination if they did not use their vehicles to deliver UPS packages.

73. On-Road-Supervisors' use of their personal vehicles to deliver packages violates the collective bargaining agreement.

*William Grey Covered Up Accidents and Injuries*

74. Upon information and belief, Mr. Murray has evidence of Defendant Grey and UPS senior management engaging in workplace intimidation of the supervisors by failing to report countless automobile accidents and forcing them to manipulate the accident scenes to decrease the company's insurance liability. For example:

    a. In a text message, William Grey instructed Mr. Murray to move the UPS vehicle into the middle of the block by saying, "make it more in the middle of the street." This is important because the insurance carrier charges UPS more for accidents in the intersection than in the middle of the block.

    b. On or about January 8, 2018, at 9:37 a.m., Mr. Murray received the following text message from William Grey: "Call me ASAP." Mr. Murray called William Grey at 9:41 a.m. They spoke for several minutes, and William Grey provided Mr. Murray with the address to an accident scene. At 10:16 a.m., William Grey asked Mr. Murray, "Are u there." At 10:17 a.m., Mr. Murray responded, "No, 7 mins". At 10:18 a.m., William Grey responded, "Magic" (code for coverup).

    c. On or about October 2, 2017, at 8:26 p.m., near Avenue J and E 5th Street in Brooklyn, NY, an accident occurred with a UPS delivery truck at the intersection. William Grey instructed Mr. Murray to go to the screen of the accident and "work magic." William Grey did not report this accident.

    d. On or about March 1, 2018, at 3:22 p.m., Defendant Grey sent Mr. Murray the following text message: "try reg duty if possible and still work with him." "Thanks and I can still give him off Monday. Will have comp # for meds later today, or in am." In this case, a driver got hurt, and William Grey is instructing Mr. Murray to get the doctor

to put him on regular duty so it does not come up as a lost-time injury, and they will give him off on Monday.

75. Mr. Murray has evidence of Defendant Grey and UPS senior management engaging in workplace intimidation of the drivers and workers injured on the job by prohibiting them from visiting their doctors and forcing them to visit designated "company medical experts" who would misdiagnose them.

    a. On or about August 30, 2017, at 6:58 a.m., Mr. Murray received a text message from Driver Rose Sheldon: "Gm going to the hospital still limping ice didn't work think I need some muscle relaxer?" Mr. Murray informed William Grey and William Grey instructed him to stop the driver from going to the hospital. At 8:18 a.m., Mr. Murray texted the driver, "Call me asap." During that call, Mr. Murray convinced the driver not to take workman's comp or medical leave. William Grey did not report this accident.

    b. On or about August 1, 2018, at 3:45 p.m., Mr. Murray received a text message from Deshaun Davis. It was a text about Deshaun Davis's injury while on the job. William Grey prohibited Mr. Murray from filing an accident report, and instead, he instructed him to offer time off and the number to a "UPS-friendly" doctor.

    c. On or about May 11, 2018, at 4:44 p.m., Mr. Murray received a text message from Driver Reel, stating: "I'm taking a couple of mins to go get this cleaned up; got caught on a city garbage can." This driver had a massive gash on his hand. This accident was not reported, and William Grey instructed Mr. Murray to take care of it, stopping the driver from seeking medical attention and going on medical leave.

76. Defendant Grey would send On-Road Supervisors with the drivers to his medical experts and have the experts downplay the severity of the injury and designate the worker to work on light or regular duty.

77. On one occasion, via text message, Defendant Grey instructed Mr. Murray to coach an emergency room doctor to give the injured delivery driver a regular duty return to work status:

    a. On or about March 1, 2018, at 2:05 p.m., Mr. Murray received the following text from William Grey: "Call me." Mr. Murray called. They spoke for about 30 minutes about an injured driver who would need medical attention and possible medical leave. At 3:21 p.m., William Grey sent the following text message: "Did u understand." At 3:22 p.m., William Grey instructed Mr. Murray to get the Emergency doctor to provide the injured driver with "reg duty if possible…". William Grey followed up at 3:24 p.m. with, "Thanks, and can still give him off Monday. Will have comp # for Meds later today or in the am."

78. Mr. Murray has evidence of Defendant Grey and UPS senior management engaging in workplace intimidation of the supervisors and drivers by making them scan packages as if a valid delivery attempt was made to the package delivery address when no attempt was made to avoid a missed delivery.

13

79. Mr. Murray has evidence of Defendant Grey and UPS senior management engaging in workplace intimidation of the drivers by making them implement a negligent "Driver Release" policy. This policy forces drivers to leave packages in high-risk areas. Drivers are then terminated due to this policy if a package is stolen.

80. Mr. Murray has evidence of Defendant Grey and UPS senior management engaging in workplace intimidation by prohibiting the submission of gasoline expense reports or changing the gasoline expense reports submitted by the On-Road Supervisors. Defendant Grey and UPS Management would also reduce the miles reported by the On-Road-Supervisors, so it does not "look bad" on the expense reports. This is a clear act of unjust enrichment by UPS.

## PLAINTIFF DANIEL MOYLE

81. Plaintiff Moyle is a former employee of Defendant UPS who was employed as a Business Manager, On-Road-Supervisor, and Delivery Driver. With over seven (7) years of experience working for UPS, first as a package delivery driver, then as an On-Road-Supervisor, and ending as a Business Manager. Plaintiff Moyle is more than qualified to have worked as a Business Manager for UPS.

82. Defendant UPS employed Mr. Moyle from approximately July 9, 2012, until August 21, 2019.

83. As an "On-Road Supervisor, Mr. Moyle's work duties required neither discretion nor independent judgment.

84. Mr. Moyle is a whistleblower who raised complaints regarding document manipulation, fraudulent reporting of accidents, (DOT) hours of service violations, massive overtime theft of the driver and "On-Road Supervisors, as well as other abuses by Defendant UPS by and through its management.

85. Mr. Moyle sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while an employee of UPS-by-UPS senior management.

86. Mr. Moyle has first-hand knowledge of UPS violating the U.S. Department of Labor's wage and hour laws.

87. UPS senior management stole hundreds of hours of overtime from a class of drivers. Mr. Moyle has evidence of some drivers working seventeen (17) to eighteen (18)-hour shifts. The plaintiffs allege that all overtime hours were not reflected on the driver's paychecks.

14

88. Mr. Moyle is prepared to reveal the scheme that UPS senior management instructed the Business Manager to execute regarding stealing overtime hours from the delivery drivers.

89. Mr. Moyle is prepared to reveal how managers and supervisors would go into the GTS and change the delivery drivers' punch-in and punch-out times. This illegal act reduces the driver's daily and weekly hours worked.

90. Upon information and belief regarding the DOT violations, Mr. Moyle has witnessed countless hours of DOT hour manipulation. The stolen time is a pattern and practice of the company and its management team to manipulate the DOT rules and regulations.

91. Upon information and belief, UPS senior managers knowingly and willfully require on-road supervisors and Business Managers to work beyond their allotted DOT hours.

92. Upon information and belief, over his 7-year career at UPS, Mr. Moyle was under constant pressure from his superiors to engage in unethical and illegal activities to cheat workers, customers, and insurance carriers.

93. Upon information and belief, the mafia-like bullying tactics were not just used against Mr. Moyle but were used as a common tactic to get business done across the board. Mr. Moyle has evidence to prove that UPS bosses – throughout the organization, promote the falsification of company records to mislead customers, lower insurance premiums, and make their internal balanced scorecards look more favorable.

94. Upon information and belief, Mr. Moyle is prepared to demonstrate how UPS uses its shoddy and unethical business practices to discipline or discharge its employees at any time arbitrarily and for disguised reasons – such as age, disability status, race, or whether the individual is part of the "in-crowd."

95. Upon information and belief, Mr. Moyle worked for Tommy Francis when he first entered UPS and was a supervisor. Tommy Francis taught Mr. Moyle how to cover up crashes and injuries by often dispatching Mr. Moyle to the scene of a crash and asking Mr. Moyle to pay for minor damages with his own money.

96. Upon information and belief, Tommy Francis thought the number of crashes he covered up was amusing. Tommy Francis kept a little black book containing a log of all the injuries and accidents he covered up. Mr. Moyle knew that if he defied Tommy Francis, it would hurt his career.

97. Tommy Francis required everyone who worked under him to cheat.

15

*Mr. Moyle Blows The Whistle On An Accident Coverup*

98. Upon information and belief, during the First Quarter of 2019, one of Mr. Moyle's drivers, Ramadan Abdul–Salaam, reported to his supervisor, Reinaldo Madera, that he slipped and fell. Reinaldo Madera, Rey, and Alex De La Rosa went to the scene and spoke with him.

99. Approximately two (2) weeks later, Mr. Abdul-Salaam approached Mr. Moyle and informed him that his leg was still nagging him, and he felt that he needed medical attention.

100. Mr. Moyle called Chance Stewart to report the injury. Chance Stewart instructed Mr. Moyle to suppress the injury. At that point, Mr. Abdul-Salaam had already seen his doctor and sent Mr. Moyle a doctor's note.

101. While disregarding Mr. Abdul-Salaam's doctor's note, Chance Stewart sent Mr. Moyle a text message: "Also Call Tony Hussein. Do u have his number." Tony Hussain is a driver at the 43rd Street Facility. Tony Hussein has a common nickname known throughout the North Atlantic District – "The Safety Mafia." Tony Hussein works hand in hand with the facility manager, Justin Laporte, and together, they cover up crashes and injuries as they occur. Tony Hussein is known to make accidents and injuries go away.

102. Tony Hussein, the Safety Mafia, is a veteran delivery driver who is always readily available to take calls for help from managers and supervisors. After fielding accident calls, Tony Hussein rushes out to the scene and convinces drivers to either not report an injury or help sweep an accident under the rug. Upon information and belief, Tony Hussein made an injured UPS driver exit an ambulance and not report his accident injury.

103. Ignoring Tony Hussein's pressure campaign, Mr. Moyle officially reported Mr. Abdul-Salaam's injury. Mr. Moyle's actions angered Chance Stewart and landed Mr. Moyle in a heap of trouble.

*Mr. Moyle Is Retaliated Against For Reporting Mr. Abdul-Salaam's Injury*

104. Upon information and belief, after Mr. Moyle went against Chance Stewart and Tony Hussein's wishes and reported Mr. Abdul-Salaam's injury, he was approached by Chance Stewart to engage in another coverup. This time, Chance Stewart demanded that Mr. Moyle work with Tony Hussein regarding a crash in a center managed by Manny Pujols. Mr. Moyle refused, and that spelled the beginning of the end of his tenure at UPS.

16

105. Upon information and belief, Chance Stewart was on a mission to make Mr. Moyle's life a living hell.

106. Chance Stewart began by requesting that Terri Murphy, the Metro New York Safety Manager, launch an "investigation" into Mr. Moyle concerning Mr. Abdul-Salaam's injury.

107. Although he was aware of Mr. Abdul-Salaam's injury at the time, Chance Stewart falsely reported Mr. Moyle for failing to report Mr. Abdul-Salaam's injury, resulting in a "Lost Time." injury.

108. As the safety manager for the New York Metro region, Terri Murphy orchestrates and promotes many tactics for covering up injuries and accidents.

109. Upon information and belief, injuries, accidents, and, more specifically, lost time injuries are all negative hits on Terri Murphy's balanced scorecard. Upon receiving Chance Stewart's complaint, Terri Murphy was furious that she was charged with this severe blemish on her balance scorecard.

110. Terri Murphy directly threatened Mr. Moyle on several occasions. On one of those occasions, Terri Murphy said, "This injury better not go lost time!"

111. Upon information and belief, the rules only apply to some. As a result of Mr. Moyle reporting Mr. Abdul-Salaam's injury, he was subjected to conference call harassment, public ridicule, threats of termination, heightened scrutiny of his work product, excessive, unnecessary additional training, and harassment by company security.

112. Mr. Moyle is aware of UPS's pattern and practice of punishing managers who speak up, and it's called "grinding. "Mr. Moyle suffered an immediate increase in the hours he was required to work. Mr. Moyle went from working forty (40) to five (45) hours a week to being required to work 60 to 70 hours a week.

*Mr. Moyle Suffered From Depression and Severe Anxiety*

113. During the spring of 2019, the stress and pressure became too much for Mr. Moyle. As a United States Marine Corps war veteran, Mr. Moyle's integrity and honor were being attacked.

114. Mr. Moyle was being punished for going against Chance Stewart and Terri Murphy by reporting the injury of Mr. Abdul-Salaam. He was required to work longer hours and was threatened with being relocated to a branch over a hundred miles from his home.

17

115.   Mr. Moyle has witnessed countless supervisors and managers get rotated to undesirable locations far from their homes and required to work undesirable hours if they go against UPS management.

116.   For example, in 2018, during Mr. Moyle's time as the Knickerbocker manager in Manhattan South, Mr. Moyle covered his manager's entire operation when Frank Casalino took a vacation.

117.   During one particular week that Mr. Moyle was covering, Brian Cannon, Frank Casalino's manager, reached out to Mr. Moyle for an update on the Manhattan South operation.

> Brian replied, "Nice job, how come Manhattan South can't do it when Frank is there?  All roads lead to Frank.  He fucking sucks.  I can't wait to send that guy packing."

118.   Shortly after, Brian Cannon was promoted to president of the North Atlantic District, and shortly after that, he did exactly what he promised. He sent Frank packing.

119.   Brian Cannon sent Frank Casalino to an operation in upstate New York. One of Frank's buildings was located over 100 miles away from his home. This goes against the maximum miles outlined by UPS company policy. This was all done solely to intimidate and harass Mr. Moyle.

120.   Upon information and belief, it was a known fact that Brian didn't like Frank, even poking fun at him during meetings. Now Brian was in a position where he could make Frank miserable – and he did.

*Mr. Moyle Goes on Short-Term Disability and Is Notified That He Is Being Demoted and Reassigned To Upstate New York*

121.   Mr. Moyle's depression came to a head on May 9, 2019, when he was summoned to the 43rd Street office to be interviewed by security.

122.   Chance Stewart and Terri Murphy implemented this game to retaliate against Mr. Moyle. They subjected Mr. Moyle to constant drilling and fake investigations from UPS company security.

123.   This constant harassment caused Mr. Moyle to have a panic attack, which resulted in a diagnosis of depression and severe anxiety.

   a.   Mr. Moyle was out on medical leave for 3.5 months.

b. Mr. Moyle's doctor prescribed Lorazepam.[3] and Duloxetine[4].

c. The side effects of Lorazepam:

i. Drowsiness, dizziness, loss of coordination, headache, nausea, blurred vision, change in sexual interest/ability, constipation, heartburn, or appetite change.

d. The side effects of Duloxetine:

i. Difficulty sleeping, headaches, dizziness, blurred vision, and constipation or diarrhea.

124. Forty (40) days into his disability leave, Mr. Moyle's position as the Knickerbocker manager was given to Brian Mactavish. Mr. Moyle then learned through Leo Cummings (Chance Stewart's supervisor) and Chance Stewart that he would be relocated to a location in Upstate New York upon his return.

125. Mr. Moyle had a conversation with Leo Cummings and Chance Stewart one (1) month before his medical leave was scheduled to end. Mr. Moyle informed them that he would need the following accommodations to return to work:

a. Ability to audio record conversations to aid with his memory retention issues.

b. Natural lighting in his workspace, or a "white noise" machine or noise-canceling headphones to aid with his ability to concentrate.

c. A set schedule so Mr. Moyle could attend therapy and frequent doctor visits. As well as to balance out the groggy effects of the medication, Mr. Moyle was prescribed.

126. Upon information and belief, Leo Cummings and Chance Stewart denied Mr. Moyle's accommodation request and failed to provide him with any alternatives.

127. Leo Cummings and Chance Stewart informed Mr. Moyle that his new job location would be in Upstate New York, and when he returned, he would no longer be a District Manager. As a result, Mr. Moyle was forced to resign 3.5 months into his medical leave.

///

///

///

---

[3] This medication is used to treat anxiety. Lorazepam belongs to benzodiazepines, which act on the brain and nerves (central nervous system) to produce a calming effect.
[4] Duloxetine is used to treat major depressive disorder in adults.

**PLAINTIFF ROY WELSH**

128.  Plaintiff Welsh has served in the United States Marine Corps and the Israeli Defense Forces. Mr. Welsh has received numerous commendations for his involvement in countless missions beyond the wire. As a Marine and an Israeli soldier, Mr. Welsh followed orders. When superiors at UPS instructed him to work as directed, Mr. Welsh took their words seriously. And like the military, Mr. Welsh trusted them to guide him towards correctly understanding and interpreting UPS methods and procedures.

129.  The Defendants employed Mr. Welsh from approximately June 26, 2016, until July 20, 2019.

130.  Plaintiff Welsh is a former employee of Defendant UPS who was employed as an On-Road-Supervisor and Delivery Driver. With over three (3) years of experience working for UPS, first as a driver and ending as an "On-the-Road Supervisor," Plaintiff Welsh is more than qualified to have worked as an On-Road Supervisor.

131.  Before becoming an "On-the-Road Supervisor," Plaintiff Welsh had previously worked as a UPS delivery driver, satisfying the driving, package delivery, customer needs, GTS and SEAS, and observations experience requirements for the "On-Road-Supervisor" position. Plaintiff Welsh is currently thirty-six (36) years old, meaning he was well over twenty-one (21) years old when he assumed the "On-the-Road Supervisor" position. As a U.S. citizen who resided in NYC at the time of his employment, Plaintiff Welsh satisfied the U.S. citizen and geographic location requirements for an On-Road Supervisor.

132.  Mr. Welsh's work duties required neither discretion nor independent judgment.

133.  Mr. Welsh is a whistleblower who raised concerns about document manipulation, fraudulent reporting of accidents, management readiness exam cheating, DOT hours of service regulation violations, massive overtime theft of the drivers and on-road supervisors', and other abuses by UPS management.

134.  As was the case with Mr. Murray, Mr. Welsh raised his concerns with human resources surrounding the discriminatory and retaliatory actions of his supervisor and one of the UPS employees. He also raised concerns about the lack of safety concerning the number of hours On-Road-Supervisors are required to work and the quick turnaround time for them to return to work for meetings or the next shift.

20

135.    Mr. Welsh sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while an employee of UPS by his former manager, Chance Stewart, and UPS senior management.

136.    Mr. Welsh has firsthand knowledge of UPS violating the U.S. Department of Labor and New York State wage and hour laws.

137.    Mr. Welsh is prepared to prove that UPS senior management stole hundreds of hours of overtime from a class of package delivery drivers. The evidence will show that many drivers start work at 7 a.m. or 9 a.m. and punch out at 10 p.m. or 12 a.m. That is an average of fifteen (15) to seventeen (17) hours a day. In a five (5)-day work week, these drivers work an average of sixty (60) to seventy (70) hours weekly. Many of these drivers work six days a week, which brings their hours into the mid-'80s and '90s. Some drivers work seventeen (17) to eighteen (18)-hour shifts; however, the overtime hours were not reflected on the drivers' paychecks.

*Anthony Celano Instructs Staff to Scrub All Discrepancies*

138.    On Friday, November 25, 2016, as Mr. Welsh was closing the building, Anthony Celano instructed Mr. Welsh, along with a fellow On-Road Supervisor, to stay at the office "as long as it takes to scrub out all discrepancies."

139.    Upon information and belief, this means that hundreds, if not thousands, of packages that had not been delivered that day would have scans on them to excuse their service failures. It helps a manager's numbers, which helps a manager's balanced scorecard, directly affecting their pay raise and promotion likelihood.

140.    Upon information and belief, Mr. Welsh had no idea what discrepancies were or what it meant to 'scrub' ODSE at the time, but he sat along with Alfonso Macera,[5] and 'scrubbed' ODSE until approximately 2 a.m.

141.    Upon information and belief, the following day, while heading to work, Anthony Celano reached out to Mr. Welsh, asking where the printouts of the scrubbed discrepancies could be found in case he was audited. As Mr. Welsh arrived at work, he gave him the printouts, but Anthony Celano was fuming.

142.    He tossed the stack of documents at Mr. Welsh's feet, saying, "It's too late, you fucking idiot."

---

[5] An On-Road-Supervisor was later arrested for stealing off routes and selling them to Bronx pawn shops.

21

143.   Mr. Welsh requested a sit-down with Anthony Celano later that day to clear the air. When they met, Mr. Welsh asked him to criticize him for his performance. In this case, his performance was sub-par in Anthony Celano's eyes because Mr. Welsh had forgotten to place a stack of papers on his desk at 2 a.m. after unknowingly cheating on his behalf.

144.   Mr. Welsh told Anthony Celano he expected to own his successes and failures. Anthony Celano interrupted Mr. Welsh, saying, "I'll tell you whatever the fuck I feel like." He then handed Mr. Welsh his phone and said, "Go ahead. Call the 1-800 number on me. I dare you. It won't be the first time." He then threw Mr. Welsh out of his office; this was Mr. Welsh's first taste of a culture encouraging delivery records' falsification.

### *Hector Fortis Called Mr. Welsh A Faggot*

145.   One of the most distressing moments of Mr. Welsh's employment with UPS came in his dealings with Hector Fortis, a former service provider and current Local 804 Business Agent in the Metro New York Ops Group.

146.   A few months before Mr. Welsh left UPS, he had an interaction with Hector Fortis in which Hector Fortis called Mr. Welsh a "faggot."

147.   Mr. Welsh, a heterosexual male with many LGBTQ members amongst his family, friends, and staff, approached Hector Fortis immediately to clear up the incident and let him know it was unacceptable. Hector became enraged and approached Mr. Welsh in a threatening manner[6].

148.   Mr. Welsh told Hector Fortis that it is unacceptable for hourly employees to perceive that their business agent harbors homophobic views. Rather than apologizing, Hector Fortis screamed at Mr. Welsh.

149.   Mr. Welsh filed a complaint with Lloyd Hall, his business manager. Lloyd Hall told him it would blow over, and Hector Fortis's bark was worse than his bite. Mr. Welsh reiterated that his bark was his concern as homophobia is unacceptable to him due to his many relationships with members of the LGBTQ community and the fact that some of the staff identify as gay. He also raised concerns about his physical safety since Hector got into his face in a threatening manner.

[6] He got in his face, nose to nose.

150.     Lloyd Hall warned Mr. Welsh against making a "big deal" out of this incident and reminded him that bad things happen to managers and employees who create UPS problems.

151.     Mr. Welsh called the 1-800 number to complain of Hector Fortis's behavior for fear of his safety. Mr. Welsh mentioned on the call that hate crimes are rising in New York City and that hateful language often correlates with such crimes. Mr. Welsh reported this incident to Human Resources as well. He never heard anything else from Defendant Corporation on the matter.

*Mr. Welsh Is Required To Work Unthinkable Hours Without Help*

152.     Mr. Welsh worked Tuesday-Saturday from 6:30 a.m. to 5 p.m. This schedule was in line with his religious practices and would allow Mr. Welsh to be home before sunset.

153.     Upon information and belief, Mr. Welsh's work schedule changed dramatically after reporting Hector Fortis. Mr. Welsh went from working an average of forty (40) to fifty (50) hours a week to working from 7 a.m. until 11 p.m.

154.     During this period, Mr. Welsh was responsible for everything in operation from dispatch until the end of the day. Mr. Welsh performed these duties without the benefit of a secretary and often without a mechanic present.

155.     There were several instances where Mr. Welsh paid a secretary out of his pocket ($50 plus dinner) to have assistance with driver timecards at the end of the day so he could go home at a manageable hour. Upon information and belief, Mr. Welsh was the only On-Road Supervisor who had to pay out of pocket to have a secretary at his location. Mr. Welsh's comparator, Fari Murray, did not have this experience.

156.     Upon information and belief, Mr. Welsh knows that Rhonda Ward was consulted about the Yonkers Center not having a secretary on Saturdays, and no action was taken to correct the problem. There were a few instances where Mr. Welsh received calls from Rhonda Ward and Lloyd Hall after 11:30 p.m. on Saturday, asking questions about the operation results. These calls were responses to Mr. Welsh's earlier phone calls. They purposely called in late to keep Mr. Welsh at work all day.

*Retaliation For Reporting Hector Fortis Led To Severe Anxiety And Depression*

157.     The constant retaliation caused Mr. Welsh to develop high blood pressure. This led Mr. Welsh to seek medical attention, which resulted in a diagnosis of depression and severe anxiety.

23

a. Mr. Welsh was out on medical leave for two months.

b. Mr. Welsh was prescribed Escitalopram[7].

c. The side effects of Escitalopram are:

    i. blurred vision, tunnel vision, eye pain or swelling, or seeing halos around lights;

    ii. racing thoughts, unusual risk-taking behavior, feelings of extreme happiness or sadness;

    iii. Low sodium levels in the body include headache, confusion, slurred speech, severe weakness, vomiting, loss of coordination, and feeling unsteady.

158. Due to the experience of the side effects of Escitalopram, Mr. Welsh informed Lloyd Hall and Justin LaPorte (Lloyd's manager) that he would need reasonable accommodations when he returned to work after his short-term disability leave. Upon information and belief, Mr. Welsh requested the following accommodations:

a. A return to the set schedule of 6 a.m.-5 p.m. so he could be home by sundown;

b. The ability to work from home two days out of the week so he could attend medical appointments;

c. White light in the office to reduce headaches and improve concentration.

d. Removal of Hector Fortis from the facility or his work shift.

e. The ability to take lunch breaks free of retribution.

159. Upon information and belief, Lloyd Hall denied Mr. Welsh's accommodations request and informed him that he would be transferred to the Parsippany, New Jersey, pre-load location. In light of this apparent act of retaliation and left with no other alternative, Mr. Welsh resigned from the company.

**PLAINTIFF TYLER LILLY**

160. Plaintiff Lilly is a former employee of Defendant UPS who was employed as an On-Road-Supervisor and Delivery Driver. With over three years of experience working for UPS, first as a package delivery driver, then as an "On-Road-Supervisor." Plaintiff Lilly is more than qualified to have worked as an On-Road-Supervisor for UPS.

---

[7] Escitalopram, sold under the brand names Cipralex and Lexapro, is an antidepressant of the selective serotonin reuptake inhibitor (SSRI) class. Escitalopram is mainly used to treat a major depressive or generalized anxiety disorder.

161.   The Defendants employed Mr. Lilly from 2019 until 2022.

162.   Mr. Lilly's work duties required neither discretion nor independent judgment.

163.   Mr. Lilly is a whistleblower who raised concerns about document manipulation, fraudulent reporting of accidents, management readiness exam cheating, DOT hours of service regulation violations, massive overtime theft of the driver, and other abuses by UPS management.

164.   As was the case with Mr. Murray, Mr. Welsh, Mr. Steele, and Mr. Moyle, Mr. Lilly raised concerns with human resources surrounding the lack of safety concerning the number of hours On-Road-Supervisors and delivery drivers are required to work, as well as the quick turnaround time for them to return to work for meetings or to work another shift.

165.   Mr. Lilly sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while an employee of UPS by his former managers and UPS senior management.

166.   Mr. Lilly knows firsthand about UPS violating the U.S. Department of Labor and New York State wage and hour laws.

167.   Mr. Lilly is prepared to prove that UPS senior management stole hundreds of hours of overtime from a class of drivers and On-Road-Supervisors. The evidence will show that many drivers and On-Road-Supervisors start work from 7 a.m. to 9 a.m. and punch out at 10 p.m. and 12 a.m. That is an average of 15 to 17 hours a day. In a 5-day work week, these drivers and On-Road-Supervisors work an average of 60 to 70 hours weekly. Many of these drivers and On-Road-Supervisors work six days a week, which brings their hours into the mid-'80s and '90s. These hours are not reflected on their paychecks.

*Unpaid Overtime: On-Road-Supervisor*

168.   Mr. Lilly was an On-Road-Supervisor (2020-2022). As detailed above, and as evidenced by Mr. Lilly's stellar performance reviews, he was qualified to work as an On-Road-Supervisor. Mr. Lilly typically worked 60-80 hours a week as an On-Road-Supervisor.

169.   Mr. Lilly had no power to hire or fire any of the delivery drivers he monitored.

170.   For Mr. Lilly to change or adjust the schedules or hours of the delivery drivers, he was required to get permission from UPS senior management.

171.   . For Mr. Lilly to grant any request from delivery drivers (sick days, vacation days, etc.), he had to get permission from his manager or UPS senior management.

*Wage Discrimination: On-Road-Supervisor*[8]

172.  In addition to suffering overtime theft, Mr. Lilly (an African-American, Latino, and Spanish-speaking male) was a victim of wage discrimination.

173.  Upon information and belief, Mr. Lilly earned an $80,000.00 base salary as an On-Road-Supervisor, while his Caucasian male counterpart, Patrick Scanlon ("Scanlon"), earned over $100,000.00 base salary.

174.  Upon information and belief, Mr. Lilly was just as qualified as Scanlon for the On-Road-Supervisor's position.

175.  In addition to Scanlon, Mr. Lilly was compensated less than Roy Welsh, Carl Lucateli, Joseph Simeone, and Robert "Bob" Walsh. These individuals were all Caucasian, were all On-Road-Supervisors when Mr. Lilly was employed with UPS (several of them survived Mr. Lilly's tenure at UPS), and all possessed the same skills and knowledge that Mr. Lilly had when he assumed the role of On-Road-Supervisor.

176.  As an On-Road-Supervisor, there is no difference between the job descriptions, duties, or requirements for Scanlon, Roy Welsh, Carl Lucateli, Joseph Simeone, Robert "Bob" Walsh, or Mr. Lilly.

**PLAINTIFF TRAVIS STEELE**

177.  Plaintiff Steele is a former employee of Defendant UPS who was employed as a Business Manager, On-Road-Supervisor, and Delivery Driver. With over seven years of experience working for UPS, first as a package delivery driver, then as an On-Road-Supervisor, and ending as a Business Manager. Plaintiff Steele is more than qualified to have worked as a Business Manager for UPS.

178.  The Defendants employed Mr. Steele from 2014 until 2021.

179.  Mr. Steele's work duties required neither discretion nor independent judgment.

180.  Mr. Steele is a whistleblower who raised concerns about document manipulation, fraudulent reporting of accidents, management readiness exam cheating, DOT hours of service regulation violations, massive overtime theft of the driver, and other abuses by UPS management.

---

[8] These facts and claims are included to add context of Mr. Lilly's claims. These claims will be addressed in a separate filing in this District due to Defendants opposition to have it included in this case.

26

181.    Mr. Steele sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while an employee of UPS by his former managers and UPS senior management.

182.    Mr. Steele knows firsthand about UPS violating the U.S. Department of Labor and New York State wage and hour laws.

183.    Mr. Steele is prepared to prove that UPS senior management stole hundreds of hours of overtime from a class of drivers and On-Road-Supervisors. The evidence will show that many drivers and On-Road-Supervisors start work from 7 a.m. to 9 a.m. and punch out at 10 p.m. and 12 a.m. That is an average of fifteen (15) to seventeen (17) hours a day. In a five (5) day work week, these drivers and On-Road-Supervisors work an average of sixty (60) to seventy (70) hours weekly. Many of these drivers and On-Road-Supervisors work six days a week, which brings their hours into the mid-'80s and '90s. These hours are not reflected on their paychecks.

184.    Mr. Steele has evidence of some drivers and On-Road-Supervisors working seventeen (17) to eighteen (18) hour shifts. These hours were not reflected on the driver's or On-Road-Supervisors' paychecks.

*Unpaid Overtime: On-Road-Supervisor[9]*

185.    Mr. Steele was an On-Road-Supervisor (2015-2018). As detailed above, and as evidenced by Mr. Steeles' stellar performance reviews, he was qualified to work as an On-Road-Supervisor. Mr. Steele typically worked 60-80 hours a week as an On-Road-Supervisor.

186.    Mr. Steele had no power to hire or fire any of the delivery drivers he monitored. For Mr. Steele to change or adjust the schedules or hours of the delivery drivers, he was required to get permission from UPS senior management.

187.    For Mr. Steele to grant any request from delivery drivers (sick days, vacation days, etc.), he had to get permission from his manager or UPS senior management.

///

///

---

[9] As is the case with Mr. Lilly above, these facts and claims are included to add context of Mr. Steele's claims. These claims will be addressed in a separate filing in this District due to Defendants opposition to have it included in this case.

## THE WAGE AND HOUR PLAINTIFF'S[10]

188. Plaintiffs Palaguachi, Santiago, Radwan, and Payne are former employees of Defendants who were employed as delivery drivers.

189. According to UPS's Jobsite, the job description for Delivery Drivers is as follows:

> "This is a physical, fast-paced, outdoor position that involves continual lifting, lowering, and carrying packages that typically weigh 25 - 35 lbs. and may weigh up to 70 lbs. A DOT physical exam is required. Package Delivery Drivers must have excellent customer contact and driving skills. Some UPS facilities may require the ability to drive a delivery vehicle with a standard (manual) transmission. Qualified applicants must have a valid driver's license issued in the state where they live. Package Delivery Drivers are expected to comply with UPS appearance guidelines and wear the company-provided uniform."

190. Plaintiffs Payne, Santiago, Radwan, and Palaguachi were more than qualified to work as package delivery drivers and performed their job duties as required.

191. Plaintiffs Palaguachi, Santiago, Radwan, Lilly, Steele, Moyle, Welch, and Payne seek to represent a class of similarly situated individuals under N.Y. CLS CPLR § 901.


## PLAINTIFF CARLOS PALAGUACHI

192. Plaintiff Palaguachi's work duties required neither discretion nor independent judgment.

193. Plaintiff Palaguachi regularly worked more than forty (40) hours per week throughout his employment with Defendants.

194. From approximately October 2017 until May 2018, Plaintiff Palaguachi worked as a package delivery driver from approximately 8:00 a.m. until about 11:00 p.m., Sunday through Friday, typically fifty (50) to eighty (80) hours per week.

195. Defendants paid Plaintiff Palaguachi his wages through check or direct deposit throughout his employment.

196. Plaintiff Palaguachi's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendant UPS required Plaintiff Palaguachi to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime for the additional time he worked.

---

[10] In Plaintiff's second amended complaint Attachment A: Estimation of overtime hours owed, was included. Plaintiffs have opted not to include this attachment here to simplify the pleading. We can provide the Court with this attachment upon request from the Court.

28

197. Plaintiff Palaguachi kept track of his hours because it is reflected on his pay stubs under the "hours" column. Defendant UPS utilizes a time-tracking device, such as punch cards.

198. Notifications such as posted notices and written correspondences were not given to Plaintiff Palaguachi regarding overtime and wages under the NYLL.

199. Upon information and belief, Defendant UPS did not provide Plaintiff Palaguachi an accurate statement of wages, as required by NYLL 195(3).

200. Upon information and belief, Plaintiff Palaguachi is prepared to prove that William Grey and UPS Senior management instructed him to hide numerous automobile accidents.

201. Upon information and belief, Plaintiff Palaguachi is prepared to prove that the defendants instructed him to lie about delivery records like missed packages and falsely manipulate delivery attempts. The scheme Mr. Palaguachi was required to employ is as follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if Mr. Palaguachi never made the delivery attempt.

202. Plaintiff Palaguachi was required to deliver packages with his vehicle while not being compensated for the mileage or gas he used.

203. Defendants required Plaintiff Palaguachi to deliver packages out of his vehicle during the holiday season, such as Thanksgiving, Easter, and Christmas.

## PLAINTIFF WARREN PAYNE

204. Plaintiff Payne's work duties required neither discretion nor independent judgment.

205. Plaintiff Payne regularly worked more than forty (40) hours per week throughout his employment with Defendant UPS.

206. From approximately August 2017 until June 2018, Plaintiff Payne worked as a package delivery driver from approximately 8:00 a.m. until about 11:00 p.m., Sunday through Friday, typically 50 to 80 hours per week.

207. Defendants paid Plaintiff Payne his wages through check or direct deposit throughout his employment.

208. Plaintiff Payne's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendants required Plaintiff Payne to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime for the additional time he worked.

29

209. Plaintiff Payne kept track of his hours because it is reflected on his pay stubs under the "hours" column. Defendants utilize a time-tracking device, such as punch cards.

210. Notifications in the form of posted notices and written correspondences were not given to Plaintiff Payne regarding overtime and wages under the NYLL.

211. Upon information and belief, Defendants did not provide Plaintiff Payne an accurate statement of wages, as required by NYLL 195(3).

212. Upon information and belief, Plaintiff Payne is prepared to prove that Defendants instructed him to hide numerous automobile accidents.

213. Plaintiff Payne is prepared to prove that Defendants instructed him to lie about delivery records like missed packages and falsely manipulating delivery attempts. The scheme Plaintiff Payne was required to employ is as follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if Plaintiff Payne never attempted delivery.

214. Plaintiff Payne was required to deliver packages with his vehicle while not compensated for the mileage or gas he used.

215. Defendants required Plaintiff Payne to deliver packages from his vehicle during the holiday season, such as Thanksgiving, Easter, and Christmas.

## PLAINTIFF ROBERT SANTIAGO

216. Plaintiff Santiago's work duties required neither discretion nor independent judgment.

217. Plaintiff Santiago regularly worked more than forty (40) hours per week throughout his employment with Defendant UPS.

218. From approximately April 7, 2014, until October 18, 2020, Plaintiff Santiago worked as a package delivery driver from approximately 8:00 a.m. until 11:00 p.m., Sunday through Friday, typically fifty (50) to eighty (80) hours per week.

219. Defendants paid Plaintiff Santiago his wages through check or direct deposit throughout his employment.

220. Plaintiff Santiago's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendants required Plaintiff Santiago to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime for the additional time he worked.

221. Plaintiff Santiago kept track of his hours because it is reflected on his pay stubs under the "hours" column. Defendants utilized a time-tracking device, such as punch cards.

222. Posted notices and written correspondences were not given to Plaintiff Santiago regarding overtime and wages under the NYLL.

223. Upon information and belief, Defendants did not provide Plaintiff Santiago with an accurate statement of wages, as required by NYLL 195(3).

224. Upon information and belief, Plaintiff Santiago is prepared to prove that Defendants instructed him to hide numerous automobile accidents.

225. Plaintiff Santiago is prepared to prove that Defendants instructed him to lie about delivery records like missed packages and falsely manipulating delivery attempts. The scheme Plaintiff Santiago was required to employ is as follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if he never made the delivery attempt.

226. Plaintiff Santiago was required to deliver packages with his vehicle while not compensated for the mileage or gas he used.

227. Defendants required Plaintiff Santiago to deliver packages from his vehicle during the holiday season, such as Thanksgiving, Easter, and Christmas.

## PLAINTIFF AHMED RADWAN

228. Plaintiff Radwan's work duties required neither discretion nor independent judgment.

229. Plaintiff Radwan regularly worked more than forty (40) hours per week throughout his employment with Defendant UPS.

230. From approximately July 2018 until October 1, 2018, Plaintiff Radwan worked as a package delivery driver from approximately 8:00 a.m. until about 11:00 p.m., Sunday through Friday, typically fifty (50) to ninety (90) hours per week.

231. Defendants paid Plaintiff Radwan his wages through check or direct deposit throughout his employment.

232. Plaintiff Radwan's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendants required Plaintiff Radwan to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime for the additional time he worked.

31

233. Plaintiff Radwan kept track of his hours because it is reflected on his pay stubs under the "hours" column. Defendants utilized a time-tracking device, such as punch cards.

234. Upon information and belief, notifications in the form of posted notices and written correspondences were not given to Plaintiff Radwan regarding overtime and wages under the NYLL.

235. Upon information and belief, Defendants did not provide Plaintiff Radwan an accurate statement of wages, as required by NYLL 195(3).

236. Upon information and belief, Plaintiff Radwan is prepared to prove that Defendants instructed him to hide numerous automobile accidents.

237. Plaintiff Radwan is prepared to prove that Defendants instructed him to lie about delivery records like missed packages and falsely manipulating delivery attempts. The scheme Plaintiff Radwan was required to employ is as follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if Plaintiff Radwan never made the delivery attempt.

238. Plaintiff Radwan was required to deliver packages with his vehicle while not compensated for the mileage or gas he used.

239. Defendants required Plaintiff Radwan to deliver packages out of his vehicle during the holiday season, such as Thanksgiving, Easter, and Christmas.

**FIRST CAUSE OF ACTION**
**New York Labor Law CLAIM**
**(On behalf of Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan, Plaintiff Lilly, Plaintiff Steele, Plaintiff Moyle, Plaintiff Welch, and Plaintiff Payne, and all similarly situated employees)**

240. Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan, Plaintiff Lilly, Plaintiff Steele, Plaintiff Moyle, Plaintiff Welch, and Plaintiff Payne, and all similarly situated employees repeat and reallege all paragraphs above as though fully set forth herein.

241. CPLR § 901(a) provides the prerequisites for a class action. They are: a. One or more members of a class may sue or be sued as representative parties on behalf of all if:

   a. The Class is so numerous that the joinder of all members, whether otherwise required or permitted, is impracticable;

   b. There are questions of law or fact common to the Class that predominate over any questions affecting only individual members;

32

c. The claims or defenses of the representative parties are typical of the claims or defenses of the Class;

d. The representative parties will fairly and adequately protect the interests of the Class and

e. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

242. " Whether a particular lawsuit qualifies as a class action rests within the sound discretion of the trial court. In exercising this discretion, a court must be mindful of our holding that the class certification statute should be liberally construed." (*Kudinov v. Kel-Tech Constr. Inc*. 65 AD3d 481, 884 N.Y.S.2d 413 [1st Dept 2009] citing *Englade v. Harper Collins Publrs., Inc*., 289 AD2d 159, 734 N.Y.S.2d 176 [2002]).

243. The movant has the burden of establishing the prerequisites in CPLR 901(a), *Kudinov supra*. "Any error, if there is to be one, should be ... in favor of allowing the class action." (*Esplin v. Hirschi*, 402 F2d 94 [1968]).

*Numerosity*

244. CPLR §901(a)(1) requires that the Class be so numerous that the joinder of all class members is impracticable.

245. There is no 'mechanical test' to determine whether ... numerosity has been met, nor is there a set rule for the number of prospective class members which must exist before a class is certified ... each case depends upon the particular circumstances surrounding the proposed Class and the Court should consider the reasonable inferences and common-sense assumptions from the facts before it. *Friar v. Vanguard Holding Corp*., 78 AD2d 83, 434 N.Y.S.2d 698 (2nd Dept 1980).

246. Here, the Plaintiffs assert that the Defendants operate multiple package delivery facilities throughout New York.

247. According to Defendant UPS's website, it operates Package Delivery Facilities in the following cities:

33



Home > Locations > New York

## UPS Locations in New York



| | | | | | |
|---|---|---|---|---|---|
| Addison | Clifton Springs | Goshen | Lyons | Peekskill | Springville |
| Afton | Clinton | Gouverneur | Macedon | Pelham | Stamford |
| Albany | Cobleskill | Gowanda | Mahopac | Penn Yan | Staten Island |
| Albertson | Cohoes | Grand Island | Malone | Perry | Stony Brook |
| Albion | Cold Spring | Granville | Mamaroneck | Phelps | Strykersville |
| Alden | College Point | Greenlawn | Manhasset | Pine Bush | Suffern |
| Alexandria Bay | Commack | Greenville | Manlius | Pine Plains | Sunnyside |
| Allegany | Constantia | Greenwich | Marcellus | Plainview | Syosset |
| Amenia | Coram | Greenwood Lake | Margaretville | Plattsburgh | Syracuse |
| Amityville | Corning | Hamburg | Marlboro | Pleasant Valley | Tappan |
| Amsterdam | Corona | Hamilton | Maspeth | Pleasantville | Tarrytown |
| Angola | Cortland | Hampton Bays | Massapequa | Port Chester | Thornwood |
| Arcade | Cortlandt Manor | Hancock | Massena | Port Jefferson | Ticonderoga |
| Armonk | Cutchogue | Hannibal | Mattituck | Port Jefferson Station | Tonawanda |
| Arverne | Dansville | Harrison | Mechanicville | Port Jervis | Troy |
| Astoria | Deer Park | Harrisville | Medford | Port Washington | Uniondale |
| Attica | Delmar | Hastings On Hudson | Medina | Potsdam | Utica |
| Au Sable Forks | Depew | Hempstead | Merrick | Poughkeepsie | Vails Gate |
| Auburn | Dover Plains | Henrietta | Mexico | Prattsburgh | Valatie |
| Avon | Dunkirk | Herkimer | Middle Village | Prattsville | Valley Cottage |
| Ballston Spa | East Amherst | Hewlett | Middleburgh | Pulaski | Valley Stream |
| Batavia | East Aurora | Hicksville | Middletown | Queens Village | Vestal |
| Bath | East Concord | Highland Falls | Millerton | Queensbury | Victor |
| Bay Shore | East Elmhurst | Hilton | Mineola | Ravena | Waddington |
| Bayport | East Greenbush | Holbrook | Mohegan Lake | Red Hook | Wading River |
| Bayside | East Hampton | Hollis | Monroe | Rego Park | Wallkill |
| Bayville | East Islip | Honeoye | Montgomery | Rensselaer | Walton |
| Beacon | East Moriches | Honeoye Falls | Monticello | Rhinebeck | Wantagh |
| Bellerose | East Northport | Hoosick Falls | Morrisville | Richmond Hill | Wappingers Falls |
| Bellport | East Rockaway | Hopewell Junction | Mount Kisco | Ridgewood | Warrensburg |
| Binghamton | East Setauket | Hornell | Mount Vernon | Riverhead | Warsaw |
| Bohemia | East Syracuse | Horseheads | Nanuet | Rochester | Warwick |
| Boonville | Eastchester | Howard Beach | Naples | Rock Hill | Waterloo |
| Breezy Point | Elbridge | Hudson | Narrowsburg | Rockaway Beach | Watertown |

| | | | | | |
|---|---|---|---|---|---|
| Breezy Point | Elbridge | Hudson | Narrowsburg | Rockaway Beach | Watertown |
| Brentwood | Elmhurst | Hudson Falls | New Hartford | Rockaway Park | Waterville |
| Brewster | Elmira | Huntington | New Hyde Park | Rockville Centre | Watervliet |
| Bridgehampton | Elmont | Huntington Station | New Paltz | Rocky Point | Watkins Glen |
| Brockport | Elmsford | Hyde Park | New Rochelle | Rome | Wayland |
| Bronx | Endicott | Ilion | New York | Ronkonkoma | Webster |
| Bronxville | Endwell | Island Park | Newark | Roosevelt | Wellsville |
| Brooklyn | Fairport | Ithaca | Newburgh | Roslyn Heights | West Haverstraw |
| Buffalo | Falconer | Jackson Heights | Niagara Falls | Rouses Point | West Hempstead |
| Burnt Hills | Far Rockaway | Jamaica | North Babylon | Saint Albans | West Nyack |
| Cairo | Farmingdale | Jamestown | North Baldwin | Sanborn | West Sayville |
| Cambria Heights | Farmington | Johnson City | North Bellmore | Saranac Lake | West Seneca |
| Camden | Farmingville | Johnstown | North Tonawanda | Saratoga Springs | Westbury |
| Camillus | Ferndale | Kew Gardens | Northport | Saugerties | Westfield |
| Canandaigua | Floral Park | Kings Park | Northville | Savannah | Westhampton Beach |
| Canastota | Flushing | Kingston | Norwich | Scarsdale | White Plains |
| Canton | Forest Hills | Lake Luzerne | Oakland Gardens | Schenectady | Whitehall |
| Carmel | Franklinville | Lakewood | Oceanside | Seaford | Whitestone |
| Carthage | Freeport | Larchmont | Ogdensburg | Shelter Island Heights | Williamson |
| Catskill | Fresh Meadows | Latham | Olean | Shirley | Williston Park |
| Cedarhurst | Fulton | Lawrence | Oneida | Sidney | Windham |
| Center Moriches | Gansevoort | Levittown | Oneonta | Skaneateles | Woodhaven |
| Centereach | Garnerville | Lewiston | Ontario | Smithtown | Woodmere |
| Central Square | Geneseo | Liberty | Orchard Park | Sodus | Woodside |
| Central Valley | Geneva | Lindenhurst | Ossining | South Glens Falls | Woodstock |
| Chatham | Getzville | Little Neck | Oswego | South Hempstead | Wy Ntskill |
| Chester | Glen Cove | Liverpool | Oyster Bay | South Ozone Park | Yonkers |
| Chittenango | Glen Head | Lockport | Ozone Park | South Richmond Hill | Yorktown |
| Cicero | Glendale | Long Beach | Palmyra | South Salem | Yorktown Heights |
| Cincinnatus | Glenfield | Long Island City | Patchogue | Speculator | Yorkville |
| Clay | Glenmont | Lowville | Pawling | Spring Valley | |
| Clifton Park | Gloversville | Lynbrook | Pearl River | Springfield Gardens | |

248. Upon information and belief, the facilities mentioned above employ over five hundred package driver drivers each. Estimating that there are potentially over ten thousand (10,000) impacted drivers.

249. Plaintiffs submit over twenty (20) text messages to support their allegations that delivery drivers had their overtime hours stolen by Defendants. Each text message affirms that the Defendants engaged in alleged violations of the NYLL.

250. Below is a list of text messages from drivers requesting payment for stolen overtime and straight time sent to former UPS Employee and On-Road-Supervisor Fari Murray:

   a. On or about August 17, 2017, at 9:05 a.m., a driver named Blackmon sent Mr. Murray text messages with a screenshot of the time that was reduced from his timecard. His timecard reflected that he worked over 70 hours weekly, yet William Grey went into the GTS and reduced his hours to 57:13.

   b. On or about November 7, 2017, at 7:18 p.m., Driver Li sent Mr. Murray a text message stating: Are u able to fix my time from Saturday? I started at 9 and left at 8:21 p.m."

   c. On or about December 11, 2017, at 7:11 p.m., a driver named Creed sent Mr. Murray a text message stating the following: "Was Thursday 8th 7:00 to 21:47". Creed followed

35

up 2 days later, on December 13, 2017, at 11:31 a.m., stating the following: "Let me know if u can fix me hrs if not, I'll go to willi (referring to William Grey).

d. On or about May 3, 2018, and May 4, 2018, at 7:44 p.m. and 1:35 p.m., Driver Scott sent Mr. Murray a text message stating, "please fix my time" and "please fix my hrs, dude."

e. On or about May 5, 2018, at 3:59 p.m., Driver Qualis Townsend sent Mr. Murray the following text message: "can you fix my hours in from yesterday" and at 4:01 p.m., "smh they didn't put my hours in from the road yesterday."

f. On or about November 10, 2017, at 7:15 p.m., Driver Pritchard sent Mr. Murray the following text message: "Good morning, Fari. This is Pritchard. Listen, Tuesday the 7th is still in unresolved. It is showing as a scheduled day off. Please help me. Thank you." This driver worked on this day, and his whole timecard was deleted and set up as if he had the day scheduled off not to work.

g. On or about October 27, 2017, and November 9, 2017, at 8:50 a.m. and 8:35 a.m., Driver Harris Solomon sent the following text messages to Mr. Murray: "10-25 (Wednesday) Im missing 2 hours I worked from 9:00 a.m.-8:30 p.m." and "Wednesday 9:00–6:15 p.m., checked timecard its 6 hours……pls correct."

h. On or about August 24, 2018, Mr. Murray received a text message from Oleg Gezner concerning his hours worked and missing overtime. The message said: "Mon, Aug 20/18 8:20 a.m. -10:40 p.m.; Tue, Aug 21/18 8:40 a.m. – 11:13 p.m., Wed, Aug 22/18 8:40 a.m. – 11:34 p.m.; and Thu, Aug 23/18 8:40 a.m.-9:29 p.m. In 4 days, this driver worked nearly 54 hours. This driver was only paid for 40 hours.

   i. A day later, the driver sent a follow-up message to Mr. Murray, "and take a look at my timecard before it is to late." "Don't forget to change my timecard when u get a chance."

i. On or about September 26, 2018, at 3:36 p.m., Mr. Murray received a text message from Driver Jackson: "Fix my timecard from yesterday 8:40-730 p.m." This was never fixed.

j. On or about August 22, 2018, at 12:02 p.m., Creed sent Mr. Murray a text stating, "Don't forget to put in the ½ hr u owe me." Creed followed up on August 24, 2018, at 8:34 p.m., stating, "Did u put that ½ hr u owe me."

k. On or about September 28, 2017, at 9:43 p.m., Mr. Murray received the following text message from Driver Rose Sheldon: "Farah please don't forget to put my hours in 9 a.m. 2027 thx".

l. On or about May 7, 2018, at 8:48 a.m., Mr. Murray received the following text message from a UPS driver: "Did u take care of the hr u owe me for last week"

m. On or about February 19, 2018, at 12:30 p.m., Mr. Murray received the following text message from UPS driver Creed: "I need u to change my timecard for last Thursday I started at 7:00 someone change it to 7:50". At 8:00 p.m., Creed followed up: "Today is the last day to correct it, so it comes on this week check."

n. On or about January 18, 2018, at 1:14 p.m., Mr. Murray received the following text message from Creed: "Did u put in my missing hrs?" Four days later, on January 19, 2018, at 11:19 a.m., Creed followed up: "Don't forget me with some help." Mr. Murray responded, "Can only add 1 hour". Creed replied, "so add 1 hour a week then."

o. On or about October 23, 2017, at 10:19 a.m., Mr. Murray received the following text message from UPS driver Clarke Anthony: "I got paid time only for 2 days, and I finished my assignment on both days I didn't take lunch those days I spoke to Willie."

p. On or about July 21, 2018, at 8:37 p.m., Mr. Murray received the following text message from UPS driver Cece: "Hey.. This dumb chick never put in my hour the last few times I worked I've been looking for her, but she don't be in.." At 8:38 p.m., Cece followed up with the following: "The way she talking to me right now, I'm about to come there and drag her Fari." Mr. Murray responded, "I'll take care if it when did u finish." Cece responded, "After 7:30, I think ask Lara" "thanks, you're the best."

q. On or about May 2, 2018, at 7:08 p.m., Mr. Murray received the following text message from UPS driver Calix: "You never put that time in for me, boss."

r. On or about July 27, 2018, at 11:06 a.m., Mr. Murray received a text message from Driver McKenzie: "Plz remember to put the 1:15mins back for me"

s. On or about May 16, 2018, at 3:29 p.m., Mr. Murray received the following text message from Driver Mchchearan: "Remember to fix my time."

t. On or about April 4, 2017, at 10:18 a.m., Mr. Murray received a text message from Driver Lara: "Yo don't forget about my 3 hours."

u. On or about September 11, 2017, at 10:02 a.m., Mr. Murray received a text message from Driver Emile: "Please don't forget my time card. Mon: holiday pay, Tues: 8:10-8:12, Wed: 8:40-8:36, Thurs: 8:40-10:44, Fri: oph 8hrs."

v. On or about September 20, 2018, at 2:03 p.m., Mr. Murray received a text message from Eli Fernandez: "Kara said she doesn't see the hours on her check for the last 2 days as helping."

w. On or about May 14, 2018, at 7:26 p.m., Mr. Murray received a text message from Driver Darling: "the adjustment is 41 minutes or .68 clicks from Monday last week thank you."

251. " The threshold for the impracticability of joinder seems to be around forty" (*Galdamez v. Biordi Constr. Corp.*, 13 Misc. 3d 1224[A], 831 N.Y.S.2d 347, 2006 NY Slip Op 51969[U] [2006], aff'd 50 A.D.3d 357, 855 N.Y.S.2d 104 [1st Dept 2008], citing *Dornberger v. Metropolitan Life Ins. Co.*, 182 FRD 72, 77 (SD N.Y.1999; see also *Klakis v. Nationwide Leisure Corp.*, 73 A.D.2d 521, 522, 422 N.Y.S.2d 407 [1st Dept 1979]). In *Galsamez*, the Plaintiff's affidavits estimated the Class consisted of between 30 and 70 workers, and in the affidavits, other members of the proposed Class were able to recall the names of between (14) fourteen and (22) of them. The Appellate Division affirmed the lower Court's finding that the Plaintiff sufficiently established that the Class was so numerous that the joinder of all members was impracticable (*Galdamez v. Biordi Constr. Corp*, 50 AD3d 357, 855 N.Y.S.2d 104 [1st Dept 2008]).

252. Here, the Defendants cannot deny that they employ over one hundred (100) package delivery drivers in over twenty (20) locations throughout the state of New York, as Plaintiffs

allege that they worked in at least (4) four of those locations, working alongside over 100 individuals each during their employment.

253. Therefore, the numerosity requirement has been met.

### *Commonality*

254. CPLR §901(a)(2) requires there are questions of law or fact common to the Class, which predominates over any questions affecting only individual members.

255. " Commonality is not merely an inquiry into whether common issues outnumber individual issues but rather whether the use of a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." (*Pludeman v. Northern Leasing Sys., Inc*, 74 AD3d 420, 904 N.Y.S.2d 372 [1st Dept 2010], citing *Friar, supra*). Class certification is appropriate even when there are questions of law or fact not common to the Class (*Pludemon, supra,* citing *Freeman v. Great Lakes Energy Partners, LLC*, 12 AD3d 1170, 1171, 785 N.Y.S.2d 640 [2004]).

256. In this action, Plaintiffs on behalf of the Class and all similarly situated employees identify four (4) essential questions of law and fact common to all members of the putative Class:

    a. Whether Defendants paid Plaintiffs and putative Class Members all earned wages, including overtime at one-and-one-half times their regular rate for all hours worked over forty (40) per week, due to Defendants' policy of time shaving; and

    b. Whether Defendants properly compensated Plaintiffs and Class Members with all earned wages, including overtime compensation at one-and-one-half times their regular rate for all hours worked over forty (40) per week, due to Defendants' policy of impermissible rounding down of hours; and

    c. Whether Defendants properly paid Plaintiffs and Class Members with all spread of hours premium earned for workdays exceeding ten (10) hours;

    d. Whether Defendants properly provided Plaintiffs and Class Members with proper wage statements as required by NYLL § 195; and

257. Plaintiffs assert that their claims and those of the Class Members arise from a common wrong: the Defendants alleged policy of (i) failing to compensate employees for all their hours worked due to a policy of time-shaving; (ii) failing to compensate employees for all hours worked due to an impermissible policy of rounding, (iii) failing to properly provide proper

wage statements, and (iv) failing to pay the spread of hours premium for workdays exceeding ten (10) hours.

258. In determining whether an action should proceed as a class action, it is appropriate to consider whether the claims have merit (*Bloom v Cunard Line*, 76 AD2d 237, 240, 430 N.Y.S.2d 607 [1980]). However, this "inquiry is limited" (id.), and such threshold determination is not intended to be a substitute for summary judgment or trial (*Kudinov v Kel-Tech Constr. Inc*., 65 AD3d 481,482, 884 N.Y.S.2d 413 [2009]). Class action certification is thus appropriate if, on the surface, there appears to be a cause of action that is not a sham (*Brandon v Chefetz*, 106 AD2d 162, 168, 485 N.Y.S.2d 55 [1985]). *Pludeman, supra*.

259. Here, the Plaintiffs have established common questions of law and fact that predominate over any questions affecting only individual members as to the alleged issues of time shaving, rounding down, wage statement violations, and spread of hours premium.

260. The commonality is met when an employer "failed to pay the required prevailing wage and supplemental benefits owed to" their employees (*Stecko v RLIIns. Co*., 121 AD3d 542, 543, 995 N.Y.S.2d 13 [1st Dept 2014] ["different trades are paid on a different wage scale and thus have different levels of damages does not defeat certification"]; see *Weinstein v Jenny Craig Operations, Inc*., 138 AD3d 546, 547, 30 N.Y.S.3d 618 [1st Dept 2016] ["commonality of the claims will be found to predominate, even though the putative class members have different levels of damages"] [internal quotations omitted]; *Friar v Vanguard Holding Corp*., 78 AD2d 83, 98, 434 N.Y.S.2d 698 [2d Dept 1980] [predominance is not identity or unanimity among class members, "[similarly, the fact that questions peculiar to each individual may remain after resolution of the common questions is not fatal to the class action"]). (*Lavrenyuk v. Life Care Servs*. 2021 NY Misc Lexis 6027, aff'm 198 A.D.3d 569, 152 N.Y.S.3d 907).

261. Therefore, the Plaintiff's element of commonality has been met.

*Typicality*

262. CPLR §901(a)(3) requires the claims or defenses of the representative parties to be typical of the claims or defenses of the Class.

263. If it is shown that a plaintiff's claims derive "from the same practice or course of conduct that gave rise to the remaining claims of other class members and is based upon the same legal theory ... [the typicality] requirement is satisfied" (*Friar* at 99,434 N.Y.S.2d 698; *see also Ackerman* at 201, 683 N.Y.S.2d 179; *Freeman* at 1171, 785 N.Y.S.2d 640). Typicality does

not require the identity of issues, and the typicality requirement is met even if the claims asserted by class members differ from those asserted by other class members (*Pruitt v. Rockefeller Cetr. Props.*, 167 A.D.2d 14, 22, 574 N.Y.S.2d 672 [1991]; S*uper Glue Corp. v. Avis Rent A Car Sys., Inc.*, 132 A.D.2d 604, 607, 517 N.Y.S.2d 764 [1987]). *Pludeman, supra*.

264. Here, the Plaintiffs have demonstrated through numerous text messages and examples throughout this pleading that the Plaintiff's claims are typical of the proposed Class, as the unlawful policy and practice as alleged by the Plaintiffs are the same or similar to that of the 20 + victims (as evidence by the text messages asserted herein) who would be members of the purported Class.

265. Therefore, the element of typicality has been met.

*Adequacy*

266. CPLR §901(a)(4) requires the representative parties to fairly and adequately protect the interests of the Class.

267. If it is shown that a plaintiff's claims derive "from the same practice or course of conduct that gave rise to the remaining claims of other class members and is based upon the same legal theory ... [the typicality] requirement is satisfied" (*Friar* at 99, 434 N.Y.S.2d 698; see also *Ackerman* at 201, 683 N.Y.S.2d 179; *Freeman* at 1171, 785 N.Y.S.2d 640). Typicality does not require identity of issues, and the typicality requirement is met even if the claims asserted by class members differ from those asserted by other class members (*Pruitt v. Rockefeller Cetr. Props.*, 167 A.D.2d 14, 22, 574 N.Y.S.2d 672 [1991]; *Super Glue Corp. v. Avis Rent A Car Sys., Inc.*, 132 A.D.2d 604, 607, 517 N.Y.S.2d 764 [1987]). *Pludeman, supra*.

268. Here, the Plaintiffs have established that they can fairly and adequately protect the interests of the Class, as they are seeking the same relief as the Class Members, specifically the recovery of wages and damages suffered as a result of the Defendant's alleged unlawful policy and practice of time shaving, rounding down, wage statement violations, and spread of hours premium.

269. Plaintiffs have further established that they are represented by counsel that are qualified and experienced in handling class action litigation and can provide a catalog of prior cases, similar in nature to the instant action, that their counsels have litigated.

270. Therefore, the element of adequacy has been met.

271. CPLR §901(a)(5) requires a class action that is superior to other available methods for the fair and efficient adjudication of the controversy. A class action is the "superior vehicle" for resolving wage disputes "since the damages allegedly suffered by an individual class member are likely to be insignificant, and the costs of prosecuting individual actions would result in the class members having no realistic day in court" (*Nawrocki*, 82 A.D.3d at 536; see also *Dabrowski*, 84 AD3d at 635). (*Stecko v RLI Inc. Co*, 121 AD3d 542, 995 N.Y.S.2d 13 [2014]).

272. Plaintiffs have established that the controversy at issue involves wage disputes; therefore, the fifth element of CPLR § 901 (a) is established.

273. If the prerequisites of CPLR § 901(a) have been met, the Court must then consider the five factors provided in CPLR § 902.

274. Among the matters which the Court shall consider in determining whether the action may proceed as a class action are:

    a. The interest of members of the Class in individually controlling the prosecution or defense of separate actions;

    b. The impracticability or inefficiency of prosecuting or defending separate actions;

    c. The extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

    d. The desirability or undesirability of concentrating the litigation of the claim in the particular forum;

    e. The difficulties are likely to be encountered in the management of a class action.

275. The elements required under CPLR §§ 902(1), (2), (4), and (5) have been satisfied and discussed above as part of the commonality, typicality, and superiority requirements under CPLR §901(a). Regarding CPLR § 902(3), the Plaintiff asserts there is no extensive, competing litigation already commenced by any member of the Class.

276. Based on the foregoing, the motion to certify the Class must granted.

277. Plaintiffs, the Class, and all similarly situated employees are damaged in an amount to be determined at trial.

///

///

///

///

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE OVERTIME PROVISIONS**
**OF THE NEW YORK STATE LABOR LAW FOR FAILURE TO PAY**
**MINIMUM AND STRAIGHT-TIME WAGES**
**(On behalf of Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan, Plaintiff Lilly,**
**Plaintiff Steele, Plaintiff Moyle, Plaintiff Welch, and Plaintiff Payne, and all similarly**
**situated employees)**

278. Plaintiffs and all similarly situated employees repeat and reallege all paragraphs above as though fully set forth herein.

279. As detailed above, the Plaintiffs and the Class were qualified to work as a Package Delivery Driver.

280. Upon information and belief, Defendants, in violation of NY Lab. Law § 190 et seq. and supporting regulations of the New York State Department of Labor failed to pay Plaintiffs, the Class, and all similarly situated employees overtime compensation at rates of one and one-half times the regular rate of pay for each hour worked more than forty (40) hours in a workweek.

281. Upon information and belief, the Defendants failed to pay Plaintiffs, the Class, and all similarly situated employees overtime compensation was willful within the meaning of NY Lab. Law § 663.

282. Upon information and belief, Plaintiffs, the Class, and all similarly situated employees are entitled to recover from Defendants their unpaid overtime wages, liquidated damages as provided for by the NYLL, reasonable attorneys' fees and costs, and pre-judgment and post-judgment interest.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE NOTICE AND RECORDKEEPING**
**REQUIREMENTS OF THE NEW YORK LABOR LAW**
**(On behalf of Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan, Plaintiff Lilly,**
**Plaintiff Steele, Plaintiff Moyle, Plaintiff Welch, and Plaintiff Payne, and all similarly**
**situated employees)**

283. Plaintiffs, the Class, and all similarly situated employees repeat and reallege all paragraphs above as though fully set forth herein.

284. Upon information and belief, upon their hiring and throughout their employment, Defendants failed to provide Plaintiffs and all similarly situated employees with a written notice, in English, Spanish, or Arabic (Plaintiff's Palaguachi primary language), containing the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece,

42

commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular payday designated by the employer; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if separate; and telephone number of the employer, as required by NYLL § 195(1).

285. Upon information and belief, the Defendants had numerous opportunities to cure this issue throughout their employment, but they never did. Defendants could have cured this during training, hiring, performance reviews, and payday.

286. Upon information and belief, Plaintiffs, the Class, and all similarly situated employees are damaged in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE WAGE STATEMENT PROVISIONS**
**OF THE NEW YORK LABOR LAW**
**(On behalf of Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan, Plaintiff Lilly, Plaintiff Steele, Plaintiff Moyle, Plaintiff Welch, and Plaintiff Payne, and all similarly situated employees)**

287. Plaintiffs, the Class, and all similarly situated employees repeat and reallege all paragraphs above as though fully set forth herein.

288. Upon information and belief, with each payment of wages, Defendants failed to provide Plaintiffs and all similarly situated individuals with an accurate statement listing each of the following: the dates of work covered by that payment of wages, the name of the employee, the name of employer; address and phone number of the employer; rate or rates of pay as basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked; and the number of overtime hours worked, as required by NYLL § 195(3).

289. Upon information and belief, due to Defendants' violation of NYLL, Article 6, § 195(3), Plaintiffs, the Class, and all similarly situated employees are entitled to statutory penalties of two hundred fifty dollars for each workweek that Defendants failed to provide them with accurate wage statements, or a total of five thousand dollars, and reasonable attorneys' fees and costs as provided for by NYLL, Article 6, § 198(1-d).

43

## FIFTH CAUSE OF ACTION
## UNLAWFUL RETALIATION IN VIOLATION OF NYCHRL
## (PLAINTIFF WELSH)

290. Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein.

291. At all relevant times, Plaintiff Welsh has been subject to Defendant UPS's standard practices, policies, programs, procedures, protocols, and plans, including willfully engaging in conduct that violates New York City Human Rights Law ("NYCHRL"), Administrative Code of City of New York § 8-107 (7).

292. Plaintiff Welsh participated in protected activity by making internal complaints via the 1800 hotline, complaining to upper management, and contacting human resources on many claims. After doing so, Plaintiff Welsh alleges that the defendant corporation took several adverse employment actions against them, including, among other things, being written up and subjected to heightened scrutiny of their work product, denial of their disability accommodations request, making them work egregious hours and shifts, prohibiting them from partaking in their religious observances (Shabbat Dinner).

293. Plaintiff Welsh to successfully plead a claim for retaliation under NYCHRL, he must demonstrate that: "(1) he has engaged in protected activity, (2) his employer was aware that he participated in such activity, (3) he suffered an adverse employment action based upon his activity, and (4) there is a causal connection between the protected activity and the adverse action."

294. Upon information and belief, Plaintiff Welsh's protected activities were filing a complaint concerning homophobia and requesting religious observance accommodations. Homophobia is protected under the NYCHRL. Religious observance is protected under NYCHRL.

295. Upon information and belief, Plaintiff Welsh informed UPS management about his religious observance accommodation and homophobic attack through his direct supervisor, Defendant Hall. Therefore, they knew he was participating in the protective activity by protesting homophobia and requesting religious observance accommodations. Plaintiff Welsh has phone records to support this claim.

296. Upon information and belief, Plaintiff Welsh suffered an adverse employment action when Defendant Hall denied his religious observance accommodation request and deliberately changed his schedule so he would be at work during times that directly conflicted with his religious observance practices. Plaintiff Welsh suffered an adverse employment action when

44

he was punished for reporting a fellow employee for engaging in acts of homophobia. The punishment resulted in a retaliatory work schedule and denial of religious observance requests. Plaintiff Welsh suffered an adverse employment action when Defendant Hall informed him that he would be reassigned to Parsippany, New Jersey, upon returning to work. Parsippany is located extremely far from Mr. Welsh's home.

297. Upon information and belief, the causal connection is clear. Mr. Welsh exercised his right when he went against Defendant Hall's wishes and reported his colleague for being a homophobe and when he requested a religious observance accommodation, which Defendant Hall viewed as being against the needs of the business when he was retailing against Mr. Welsh for reporting his homophobic colleague. As a result, Mr. Welsh was transferred to a location far from his home (violating UPS policy).

298. Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein.

299. As their joint employer, defendant corporation, and individual Defendant, Hall engaged in egregious prohibited conduct listed above. This conduct caused Plaintiff Welsh to suffer severe depression and anxiety, leading him to resign.

300. Defendants' actions and omissions warrant an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**UNLAWFUL RETALIATION IN VIOLATION OF NYCHRL**
**(PLAINTIFF MURRAY)**

301. Plaintiff Murray repeats and realleges all paragraphs above as though fully set forth herein.

302. Upon information and belief, at all relevant times, Plaintiff Murray had been subject to Defendant UPS's standard practices, policies, programs, procedures, protocols, and plans, including willfully engaging in conduct that violates New York City Human Rights Law ("NYCHRL"), Administrative Code of City of New York § 8-107 (7).

303. Upon information and belief, Plaintiff Murray participated in protected activity by filing a complaint with HR manager Beverly concerning his wage discrimination claims (as listed in Count Four above), the theft of overtime from the delivery package drivers, the insurance fraud by way of accident scene manipulation and accident coverups orchestrated by Defendant Grey.

304. Upon information and belief, after doing so, Plaintiff Murray alleges Defendant Corporation and Defendant Grey took several adverse employment actions against him, including, among other things, terminating him after he raised claims and provided evidence of the alleged discriminatory acts.

305. Upon information and belief, the causal connection between the protected activity and the adverse employment actions is evidenced by their temporal proximity. Within a month after filing a complaint with Beverly concerning the matters mentioned and throughout this pleading, Mr. Murray was terminated.

306. Upon information and belief, as his employer, the defendants engaged in egregious prohibited conduct listed above. This caused Plaintiff Murray to suffer from PTSD and Severe Depression.

307. Defendants' actions and omissions warrant an award of punitive damages.

### SEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
**(On behalf of Plaintiff Murray, Plaintiff Welsh, and Plaintiff Moyle)**

308. According to the doctrine of unjust enrichment, the Plaintiff must show "(1) the other party was enriched, (2) at the other party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 567 (S.D.N.Y. 2016).

### 1. DEFENDANTS WERE UNJUSTLY ENRICHED:

309. Plaintiffs Welsh, Moyle, and Plaintiff Murray repeat and realleges all paragraphs above as though fully set forth herein. Plaintiffs Welsh, Moyle, and Plaintiff Murray were required to consistently utilize their vehicle to benefit Defendant's corporation throughout their employment. Plaintiffs Welsh, Murray, and Moyle were required to pay out of pocket for gas to fill the gas tank of the defendant corporation's vehicle and fill the gas tank of their vehicle when they used their vehicle to the benefit of the defendant corporation. Plaintiffs Welsh, Murray, and Moyle were denied their thirty dollars ($30.00) monthly payment for their cellphones to conduct the Defendant corporation's business use.

### 2. UPS WAS ENRICHED AT THE EXPENSE OF
### PLAINTIFFS WELSH, MURRAY and MOYLE[11]:

*Plaintiff Welsh*:

310. Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein. Plaintiff Welsh drove his vehicle an average of three hundred (300) miles per day throughout his employment with the Defendant corporation while conducting the Defendant corporation's

---

[11] The estimated out-of-pocket cost does not include the cash payments Plaintiff Murray, Plaintiff Welsh, and Plaintiff Moyle had to pay to cover automobile accidents on the Defendant corporation.

46

business. Plaintiff Welsh was required to deliver packages while driving his vehicle, visit accident sites while driving his vehicle, conduct observations and reviews while driving his vehicle, and move "off routes." while driving his vehicle. Defendant UPS required Plaintiff Welsh to use his vehicle instead of a package car because it cannot access parkways. Personal vehicles were more expedient. There was an average of 50 off routes per day.

311. Plaintiff Welsh logged approximately seventy-eight thousand three hundred miles (78,300) miles per year on his vehicle. Plaintiff Welsh worked as an on-road supervisor for three years, which brings the approximate total mileage to two hundred thirty-four thousand nine hundred (234,900).

312. Plaintiff Welsh was required to use his money to put gas into the Defendants corporation's package cars (delivery trucks). This occurred at least three times per month at an estimated cost of fifty dollars ($50.00) per occurrence. Plaintiff Welsh was required to pay out of pocket whenever Defendants failed to procure adequate gas cards. Plaintiff Welsh estimates his uncompensated gas expense for Defendants' corporations package cars as five thousand four hundred dollars ($5,400.00) throughout his employment.

313. Besides paying out-of-pocket costs to fill the corporate Defendants' package cars, he was also required to put gas into his vehicle when he had to conduct off-route deliveries, accident site visits, and inspections. Plaintiff Welsh was required to pay approximately thirty-eight dollars and eighteen cents ($38.18) per week, which equals one hundred fifty-two dollars and seventy-two cents ($152.72) per month. Plaintiff Welsh estimates his uncompensated gas expense for delivering packages, conducting observations, and visiting accident sites on behalf of Defendant corporation as five thousand four hundred ninety-seven dollars and ninety-seven cents ($5,497.97) and totaling approximately ten thousand eight hundred ninety-seven dollars and ninety-seven cents ($10,897.97) throughout his employment.

314. Plaintiff Welsh was denied his thirty dollars ($30.00) monthly payment for using his cellphone. This occurred throughout his employment, with an estimated annual cost of three hundred sixty dollars ($360.00) and a total cost of one thousand eighty dollars ($1,080.00) for his employment duration.

*Plaintiff Moyle:*

315. Plaintiff Moyle repeats and realleges all paragraphs above as though fully set forth herein. From 2014 to 2015, Tommy Francis directed Mr. Moyle to make over five thousand dollars ($

47

5,000.00) in out-of-pocket cash payments to car accident victims to prevent them from calling the police or filing insurance claims. Mr. Moyle was not compensated for this out-of-pocket expense.

316. From 2015 to 2017, Anthony Celano directed Mr. Moyle to make over twelve thousand dollars ($12,000.00) in out-of-pocket cash payments to car accident victims to prevent them from calling the police or filing insurance claims. Mr. Moyle was not compensated for this out-of-pocket expense.

*Plaintiff Murray:*

317. Plaintiff Murray repeats and realleges all paragraphs above as though fully set forth herein. Plaintiff Murray drove his vehicle an average of one hundred fifty (150) miles per day throughout his employment with Defendant Corporation while conducting Defendant Corporation's business. Plaintiff Murray was required to deliver packages while driving his vehicle, visit accident sites while driving his vehicle, conduct observations and reviews while driving his vehicle, and move off routes while driving his vehicle. Defendant corporation required Plaintiff Murray to use his vehicle instead of a package car. There was an average of seventy-five (75) off-routes per day.

318. Plaintiff Murray logged approximately thirty-nine thousand one hundred fifty (39,150) miles per year on his vehicle. Plaintiff Welsh worked as an on-road supervisor for three years, which brings the approximate total mileage to one hundred seventeen thousand four hundred fifty (117,450) miles.

319. Plaintiff Murray was required to use his money to put gas into Defendant corporation's package cars throughout his employment. This occurred at least four times per month at an estimated cost of fifty dollars ($50.00) per occurrence. Plaintiff Murray was required to pay out of pocket whenever Defendant's corporation failed to procure adequate gas cards. Plaintiff Murray estimates his uncompensated gas expense for Defendant corporations package cars as seven thousand two hundred dollars ($7,200.00) throughout his employment.

320. He was also required to put gas into his vehicle when he had to conduct off-route deliveries, accident site visits, and inspections. Plaintiff Murray was required to pay approximately forty dollars ($40.00) per week, which equals one hundred sixty dollars ($160.00) per month. Plaintiff Murray estimates his uncompensated gas expense for delivering packages, conducting observations, and visiting accident sites on behalf of Defendant

48

corporation as five thousand seven hundred sixty dollars ($5,760.00), totaling approximately twelve thousand nine hundred sixty dollars ($12,960.00) throughout his employment.

321.    Plaintiff Murray was denied his thirty dollars ($30.00) monthly payment for using his cell phone. This occurred throughout his employment, with an estimated annual cost of three hundred sixty dollars ($360.00) annually and a total cost of one thousand eighty dollars ($1,080.00) for the duration of his employment.

### 3.  IT IS AGAINST EQUITY AND GOOD CONSCIENCE TO PERMIT UPS TO RETAIN THE OUT-OF-POCKET EXPENSES OWED TO PLAINTIFFS WELSH, MURRAY, AND MOYLE:

322.    Plaintiffs Moyle, Welsh, and Murray regularly submit monthly expense reports to Defendants throughout their employment. Defendants failed and/or refused to reimburse them for the expense report. As previously stated, on one (1) occasion, Defendant Grey chastised Plaintiff Murray for placing his expense report request in writing and informed him that the company did not have the budget to pay the expenses.

323.    UPS's 4th quarter 2020 earnings were 24.9 billion Dollars; it would be against equity and would be beyond unconscionable to permit UPS to retain Plaintiffs Moyle, Murray, and Welsh's out-of-pocket expenses.

324.    As their employer, Defendants engaged in the egregious prohibited conduct listed above. This caused Plaintiffs Welsh, Murray, and Moyle to suffer economic harm.

325.    Defendants' actions and omissions warrant an award of punitive damages.


### EIGHTH CAUSE OF ACTION
### VIOLATION OF NYC ADMINISTRATIVE CODE
### (BROUGHT ON BEHALF OF PLAINTIFF WELSH FOR
### AIDING AND ABETTING BROUGHT AGAINST DEFENDANT LLOYD HALL), and
### (BROUGHT ON BEHALF OF PLAINTIFF MURRAY FOR
### AIDING AND ABETTING BROUGHT AGAINST DEFENDANT WILLIAM GREY)

326.    According to NYC Admin. Code § 8-107(6) Aiding and abetting. It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter or attempt to do so.

*Plaintiff Welsh:*

327.    Plaintiff Welsh repeats and realleges all paragraphs above as though fully set forth herein.

328.    Plaintiff Welsh engaged in protected activity by making internal complaints via Defendant UPS's 1800 hotline, complaining to upper management, and contacting human resources on

49

many claims. After doing so, Plaintiff Welsh alleges Defendant UPS, by and through its management, and specifically, Defendant Hall, took several adverse employment actions against Plaintiff Welsh, including, among other things, being written up and subjected to heightened scrutiny of his work product, denying Plaintiff Welsh a secretary needed to effectively execute his job requirements, making Plaintiff Welsh work excessive hours and shifts, for the sole purpose of prohibiting Plaintiff Welsh from partaking in his religious observances (Shabbat Dinner).

329. The temporal proximity of Plaintiff Welsh's complaints and Defendants' response and/or actions are evidence of the causal connection between the protected activity and the adverse employment actions.

330. As Plaintiff Welsh's supervisor and/or manager, Defendant Hall engaged in the egregious prohibited conduct listed above. The conduct of Defendant Hall caused Plaintiff Welsh to suffer from severe depression and anxiety, leading him to resign.

*Plaintiff Murray:*

331. Plaintiff Murray repeats and realleges all paragraphs above as though fully set forth herein.

332. Plaintiff Murray engaged in protected activity by complaining to upper management and contacting human resources on many claims. After doing so, Plaintiff Murray alleges Defendants, and more specifically, Defendant Grey, took several adverse employment actions against him, including, among other things, being written up and subjected to heightened scrutiny of his work product, making him work egregious hours and shifts, paying him less than his Caucasian colleagues, denying him repayment for his expenses, accusing him of covering up an accident that William Grey instructed him to cover up, and terminating him after he participated in an internal investigation.

333. The temporal proximity of Plaintiff Murray's complaints and Defendants' response and/or actions are evidence of the causal connection between the protected activity and the adverse employment actions.

334. As Plaintiff Murray's supervisor and or manager, Defendant Grey engaged in the egregious prohibited conduct listed above. This egregious prohibition led to a retaliatory investigation and, ultimately, Plaintiff Murray's termination.

335. Defendants' actions and omissions warrant an award of punitive damages.

50

## NINTH CAUSE OF ACTION
### VIOLATION OF NYC ADMINISTRATIVE CODE
### (BROUGHT ON BEHALF OF PLAINTIFFS MOYLE, MURRAY,
### AND WELSH FOR EMPLOYER LIABILITY FOR DISCRIMINATORY CONDUCT BY
### AN EMPLOYEE, AGENT, OR INDEPENDENT CONTRACTOR BROUGHT AGAINST
### DEFENDANT UPS)

336. New York City Human Rights Law § 8-107(13)(b) imposes liability on the employer for its employee's conduct in three instances: (1) where the offending employee exercised managerial or supervisory responsibility; (2) where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take immediate and appropriate corrective action'; and (3) where the employer should have known of the offending employee's unlawful discriminatory conduct yet failed to exercise reasonable diligence to prevent it.

337. Plaintiffs Moyle, Murray, and Walsh repeat and reallege all paragraphs above as stated herein.

338. There is sufficient evidence from which a reasonable trier of fact could find that Defendant UPS knew or should have known about Defendant Grey, Chance Stewart, Tommy Francis, Terri Murphy, Anthony Celano, Rhonda Ward, Tim O'Connor, and Howard McLeish's conduct.

339. Defendant UPS, by and through its employees and/or agents, has engaged in egregious acts of discrimination, theft of time, insurance fraud, and cheating. When Plaintiffs complained or went against Defendants' unethical and illegal acts, Defendant UPS retaliated.

340. The temporal proximity of Plaintiffs' Moyle, Murray, and Walsh's complaints and Defendants' response and/or actions are evidence of the causal connection between the protected activity and the adverse employment actions.

341. As the employer, Defendant UPS engaged in egregious prohibited conduct listed above. This egregious prohibited conduct caused the Plaintiffs to suffer from severe depression and anxiety, leading to their termination or resignation.

342. Defendant UPS's actions and omissions warrant an award of punitive damages.

## TENTH CAUSE OF ACTION
### VIOLATION OF NEW YORK LABOR LAW § 740
### (BROUGHT ON BEHALF OF PLAINTIFF WELSH and PLAINTIFF MOYLE)

343. Plaintiffs Welsh and Moyle ("Plaintiffs") repeat and realleges all paragraphs above as stated herein.

344. At all relevant times, Plaintiffs have been subject to Defendant UPS's standard practices, policies, programs, procedures, protocols, and plans, including willfully engaging in conduct that violates NYLL § 740.

345. According to NYLL § 740, this claim is authorized and instituted based upon Defendant UPS's dangerous and potentially deadly employment practices. Specifically, the Plaintiffs complain that Defendant UPS engaged in DOT violations for the package delivery drivers and the on-road supervisors.

346. To recover under NY Lab. Law § 740 claims the Plaintiff must show that he reported or threatened to report the employer's activity, policy, or practice but need not claim that he cited any particular law, rule, or regulation at the time that Plaintiff made a report. *Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 579 (S.D.N.Y. 2019).

*Plaintiff Welsh*:

347. As previously stated, Plaintiff Welsh raised concerns with human resources regarding Defendant Corporation and Defendant Grey's unethical and dangerous practice of forcing on-road supervisors to violate DOT hours regulations.

348. Shortly after Plaintiff Welsh raised his concerns to human resources, Defendants UPS and Hall retaliated against Plaintiff Welsh by denying his religious observance request, changing his work schedule so he would be forced to work on the Sabbath, and denying his ADA accommodations request. These actions by Defendants resulted in Plaintiff Welsh's constructive discharge from Defendant UPS. The temporal proximity (less than one year) of Plaintiff Welsh's complaints and Defendant's response and/or actions are so close that an inference of retaliatory intent is undeniable. Plaintiff Welsh's constructive discharge is a clear violation of NYLL § 740.

349. Defendants' manipulation of the DOT hours for the package delivery drivers is a dangerous practice that presents a substantial and specific danger to public health or safety.

*Plaintiff Moyle*:

52

350. Plaintiff Moyle raised concerns about DOT violations with safety director Terri Murphy. On multiple occasions, Plaintiff Moyle would personally have DOT violations whenever he worked over his allotted hours. Terri Murphy would call and chastise him to go into the GTS system and reduce his hours. Plaintiff Moyle complained about fatigue and stated that he was concerned about driving without sleep and getting into accidents.

351. Plaintiff Moyle also raised concerns about the hours the package delivery drivers were required to drive. Plaintiff Moyle expressed that he feared the auto accidents were a result of the DOT violations and sleep deprivation of the drivers. Terri Murphy did not care about Plaintiff Moyle's concerns. Plaintiff Moyle believes that Terri Murphy used these complaints and the filing of the injury mentioned above to retaliate against him and get him to resign from UPS.

*Plaintiff's Moyle and Welch:*

352. As stated above, Plaintiffs Moyle and Welch were On-the-Road Supervisors." As On-the-Road Supervisors," Plaintiffs Moyle and Welch fielded multiple complaints from delivery drivers concerning their stolen or missing straight time and overtime.

353. As On-the-Road Supervisors, Plaintiffs Moyle, and Welch did not have the power to independently provide the delivery drivers with their missing or stolen time.

354. As stated above, Plaintiffs Moyle and Welch escalated the driver's concerns and demands to UPS by and through its senior management (manager, human resources, and district directors) and expressed the fact that failure to pay these drivers would decrease morale and cause these drivers to potentially drive recklessly which may increase accidents and harm the public.

355. As a result of those escalations, Plaintiff Moyle and Welch were chastised, threatened, and retaliated against for advocating for the delivery drivers' demands.

*UPS learned nothing from Walmart:*

356. One would think that UPS would learn from the deadly practices of Walmart when their DOT violations nearly cost actor-comedian Tracy Morgan his life in 2014. As is the case here, Walmart knew their package delivery driver drove beyond the allotted DOT-regulated hours. Walmart decided to place profits over people and allowed their drivers to drive with only a few hours of rest. This deadly decision by Walmart accident cost comedy writer James McNair his life.

357. In reporting the DOT hours violations to Defendant UPS human resources, Plaintiff Welsh was attempting to protect the public from potentially suffering another Walmart tragedy.

358. Defendants' treatment of Plaintiff Welsh was done out of retaliation and their disdain for individuals who dare to blow the whistle concerning Defendant's DOT practices, violating NYLL § 740.

359. Plaintiff Welsh was damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff's respectfully requests that this Court enter judgment against Defendants by:

a) Designating this action as a class action and authorizing prompt issuance of a notice according to NY CLS CPLR § 901 to all putative class members apprising them of the pendency of this action and permitting them the opportunity to opt-out of this action;

b) Declaring that Defendants violated the minimum wage provisions of, and rules and orders promulgated under, the NYLL as to Plaintiffs, the Class, and all similarly situated employees;

c) Declaring that Defendants violated the overtime wage provisions of, and rules and orders promulgated under, the NYLL as to Plaintiffs, the Class, and all similarly situated employees;

d) Declaring that Defendants violated the timely payment provisions of, and rules and orders promulgated under, the NYLL as to Plaintiffs, the Class, and all similarly situated employees;

e) Declaring that Defendants violated the notice and recordkeeping requirements of the NYLL concerning Plaintiffs, the Class, and all similarly situated employee's compensation, hours, wages, and any deductions or credits taken against wages;

f) Awarding Plaintiffs, the Class, and all similarly situated employees' damages for the amount of unpaid minimum wage and overtime compensation, and any improper deductions or credits taken against wages, as well as awarding spread hours pay under the NYLL as applicable;

54

g) Awarding Plaintiffs, the Class, and all similarly situated employees' damages for Defendant UPS's violation of the NYLL notice and recordkeeping provisions, according to NYLL §§ 198(1-b), 198(1-d);

h) Awarding Plaintiffs' liquidated damages in an amount equal to one hundred percent (100%) of the total amount of minimum wage, overtime compensation, and spread of hours pay shown to be owed according to NYLL § 663 as applicable; and liquidated damages according to NYLL § 198(3);

i) Award Plaintiff Murray the value of all compensation and benefits lost and that they will lose in the future as a result of Defendants' unlawful conduct that violated the federal and state Equal Pay laws;

j) Award Plaintiff's, the Class, and all others similarly situated compensatory and punitive damages that stem from Defendants' violation of federal and state equal pay laws;

k) Award Plaintiffs, the Class, and all others similarly situated pre-judgment interest and attorneys' fees, costs, and disbursements, as provided by law;

l) Providing that if any amounts remain unpaid upon the expiration of ninety (90) days following issuance of the judgment or ninety (90) days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen (15%) percent, as required by NYLL § 198(4); and

m) All such other and further relief as the Court deems and proper.

## JURY DEMAND

Plaintiffs and all similarly situated employees demand a jury trial on all issues triable by a jury.

Dated: Brooklyn, New York

October 10, 2023

By:  Tyrone A. Blackburn, Esq.

_____/s/ Tyrone Blackburn_____

By:  Kevin Mahoney, Esq.

55

Berkeh Alemzadeh, Esq.

_____

By:  Rodney S. Diggs, Esq.

_____

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  2:20-cv-01427-JMA-AYS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*    Chance Stewart
                                                              UPS, 315 W. Houston St,
was received by me on *(date)*   4/17/2020                .   New York, NY 10014

❏ I personally served the summons on the individual at *(place)*

_____ on *(date)* _____ ; or

                                                work place
☑ I left the summons at the individual's ~~residence or usual place of abode~~ with *(name)*    Irvini Peori

_____ , a person of suitable age and discretion who ~~resides~~ there,
                                                                              works
on *(date)*   4/20/2020        , and mailed a copy to the individual's last known address; or   Mailed on 4/21/2020
              at 2:40 pm
❏ I served the summons on *(name of individual)* _____ , who is

 designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00      .

I declare under penalty of perjury that this information is true.

Date:  4/21/2020 _____          _____
                                                    *Server's signature*

                                        John I Hudak, Process Server
                                              *Printed name and title*

                                        1204 Avenue U, Brooklyn, NY 11229
                                              *Server's address*

Additional information regarding attempted service, etc:

Approximate Description of Receipiant : Female, Black, 20s, Black Hair, 5'6"

Documents Served : Summons in a Civil Action, Demand for Jury Trial Collective Action Under 29 U.S.C. 216(b)

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Case 2:20-cv-01427-MKB-LB    Document 6    Filed 04/22/20    Page 1 of 1 PageID #: 79

Civil Action No. 20-1427

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*     Willie Gray

was received by me on *(date)*     4/17/2020          .     UPS, 13640 Springfield Blvd., Springfield Gardens, NY 11413

☐ I personally served the summons on the individual at *(place)*

_____ on *(date)* _____ ; or

☑ I left the summons at the individual's residence or usual place of ~~abode~~ work place with *(name)*   Robert Moscarella,

Intake Clerk     _____, a person of suitable age and discretion who ~~resides~~ works there,

on *(date)*     4/22/2020 at     , and mailed a copy to the individual's last known address; or   Mailed On 4/22/2020
11:35 AM

☐ I served the summons on *(name of individual)* _____, who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $     0     .

I declare under penalty of perjury that this information is true.

Date:  4/22/2020          _____
                                                    *Server's signature*

John I Hudak, Process Server
*Printed name and title*

1204 Avenue U, Brooklyn, NY 11229
*Server's address*

Additional information regarding attempted service, etc:

Documents Served : Summons in a Civil Action, Demand for Jury Trial Collective Action under 29 U.S.C 216(b)

Approximate Description of Receipient : White, Male, 30s, Brown Hair, 5'10", 190 lbs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------

FARI MURRAY, CARLOS PALAGUACHI, ROY
WELSH, DANIEL MOYLE, AHMED RADWAN,
ROBERT SANTIAGO, TRAVIS STEELE, TYLER
LILLY, and WARREN PAYNE, *individually and
on behalf of others similarly situated*,

**ORDER**
20-CV-1427 (MKB)

Plaintiffs,

v.

UNITED PARCELS SERVICE, INC., WILLIAM
GREY, and LLOYD HALL,

Defendants.

------------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

On October 17, 2023, Plaintiffs filed a proposed Fifth Amended Complaint ("FAC")

seeking to withdraw the sole federal law claim in this action. (Fifth Amended Compl., Docket

Entry No. 98.) On October 24, 2023, Magistrate Judge Lois Bloom granted Plaintiffs leave to

file the proposed FAC, making it the operative pleading. (Order dated Oct. 24, 2023.)

Based on this filing, the Court lacks subject matter jurisdiction over this action and

therefore dismisses the FAC without prejudice. *Green v. Dep't of Educ. of N.Y.*, 16 F.4th 1070,

1074 (2d Cir. 2021) ("When subject matter jurisdiction is lacking, 'the district court lacks the

power to adjudicate the merits of the case,' and accordingly 'Article III deprives federal courts of

the power to dismiss [the] case with prejudice.'" (quoting *Carter v. HealthPort Techs., LLC*, 822

F.3d 47, 54–55 (2d Cir. 2016) (alteration in the original)).

The Clerk of Court is respectfully requested to close this case.

Dated: October 26, 2023
       Brooklyn, New York

SO ORDERED:


     s/ MKB
MARGO K. BRODIE
United States District Judge

2